

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-7-2005

# USA v. Wilson

Precedential or Non-Precedential: Precedential

Docket No. 04-1918

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Wilson" (2005). *2005 Decisions*. Paper 775.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/775

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

AMENDED
PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-1918
_____

UNITED STATES OF AMERICA

v.

ESCO WILSON,

                              Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 03-cr-00005)
District Judge: Honorable Christopher C. Conner
_____

Argued February 18, 2005

Before: SLOVITER,  AMBRO
and ALDISERT, <u>Circuit Judges</u>

(Filed July 1, 2005)

Andrew F. Schneider, Esquire (Argued)
101 Mechanics Street
Doylestown, PA 18901
    *Counsel for Appellant*

Thomas A. Marino
  United States Attorney
Theodore B. Smith, III (Argued)
  Assistant U.S. Attorney
Office of the United States Attorney
Federal Building, Suite 220
228 Walnut Street
P.O. Box 11754
Harrisburg, PA   17108
    *Counsel for Appellee*

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Esco Wilson appeals the District Court's denial of his motion to suppress evidence taken from a bag in the trunk of his car. We affirm.

## I. Factual Background and Procedural History

On the morning of September 16, 2001, Trooper Brian Overcash of the Pennsylvania State Police stopped Wilson, who

was traveling west on the Pennsylvania Turnpike, for a traffic violation. Wilson concedes that the initial traffic stop was valid.

Wilson gave Overcash a valid driver's license and a car rental agreement. Overcash then returned to his patrol car to prepare a traffic citation. During this process, he examined the rental car agreement and noticed that the car should have been returned a month earlier. Overcash ran a check on Wilson's rental car and found that the car had not been reported stolen.

Overcash then returned to Wilson's car and asked Wilson to exit and stand at its rear. He gave Wilson the citation, returned his documents, and told him that he was free to leave. Wilson took a few steps back toward his car. At the suppression hearing, Overcash first testified that he then began to question Wilson about the rental car agreement. Overcash then testified, when the Pennsylvania state judge presiding over the hearing asked for clarification of the sequence of events, that he asked Wilson if he could question him about the rental car agreement, and Wilson turned around and walked back toward him.

Overcash proceeded to ask Wilson questions about the rental car and Wilson's work and travel plans. Wilson told Overcash that he usually rented cars for a month because he traveled a lot. He also told Overcash that he worked selling master compact discs ("CDs") to music stores for approximately $500 per disc. When asked where he was going, Wilson said that he was on his way to Pittsburgh to deliver the CDs he had

with him, and he offered to show these CDs to Overcash.

Overcash then walked toward the two female passengers in Wilson's car and asked them where they were going. The passengers told Overcash that they were on their way to Virginia. Overcash returned to where Wilson was standing at the rear of the car and told Wilson that the women had told him they were going to Virginia, not to Pittsburgh. Wilson appeared a bit nervous and told Overcash that he had not told his passengers where they were going but that nothing unusual was going on. Wilson again offered to show his CDs to Overcash, but Overcash declined and went to his patrol car to request support.

When Overcash returned to Wilson's car, Wilson opened the trunk and showed Overcash a CD with a $12.00 price tag on it. Overcash saw two bags in the trunk—one red and one green. Wilson told Overcash that the red bag belonged to his passengers. The women confirmed this, told Overcash that there was nothing illegal in the bag, and gave Overcash permission to search it. Overcash found clothing and personal items inside.

Wilson told Overcash that the green bag belonged to him and that it also contained clothing. Overcash asked if he could examine the bag's contents, and Wilson consented. Overcash unzipped the bag and found a brick of cocaine inside. When he looked at Wilson, Wilson had already turned around and placed his hands behind his back.

4

Overcash then arrested Wilson and his passengers and transported them to the police barracks. At the barracks, Overcash read Wilson his *Miranda* rights and Wilson stated that he did not wish to speak to the police. Later, Wilson changed his mind and, after he was read his rights again, gave both written and oral statements acknowledging that the cocaine belonged to him.

Wilson was charged under Pennsylvania law with one count of possession of a controlled substance with intent to deliver and one count of exceeding the maximum speed limit. Judge Edward E. Guido, of the Cumberland County Court of Common Pleas, held a hearing on Wilson's motion to suppress the evidence found in his car. Judge Guido granted Wilson's motion in June 2002, ordering the exclusion of the cocaine and Wilson's post-arrest statements as the fruits of an illegal detention. In September 2002, Pennsylvania entered a *nolle prosse*.

The federal Government subsequently obtained an indictment against Wilson based on the same incident. Wilson again moved to suppress the cocaine and his post-arrest statements, and the parties agreed that the matter would be submitted based on the notes of testimony from the Pennsylvania suppression hearing. No additional evidence was taken. In October 2003, the District Court denied Wilson's motion, determining, *inter alia*, that Wilson consented to Overcash's questioning after the conclusion of the traffic stop,

that no seizure had occurred, and that Wilson's consent to the search of his bag was voluntary. Wilson entered a conditional guilty plea. He reserved his right to appeal the denial of his suppression motion, and that issue is now before us.[1]

## II. Discussion

### A.    *Standard of Review*

As a preliminary matter, we must determine what the appropriate standard of review is for this case given its unique procedural posture. Ordinarily we review a district court's "denial of the motion to suppress for clear error as to the underlying facts, but exercise[] plenary review as to its legality in light of the [C]ourt's properly found facts." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (internal citations omitted). Our dissenting colleague, however, believes that in this case we should exercise plenary review over both the District Court's factual determinations and its conclusions of law because the District Court relied on the transcript of the Commonwealth suppression hearing in deciding Wilson's motion to suppress in the federal case instead of holding another evidentiary hearing. This position has merit, as there is no obvious need to defer to the District Court's factual determinations when it did not engage in any independent fact-

---

[1]The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

finding, and it is one that we have adopted in our *habeas corpus* jurisprudence under 28 U.S.C. § 2254. *See Hardcastle v. Horn*, 368 F.3d 246, 254 (3d Cir. 2004) ("Because the District Court 'd[id] not hold an evidentiary hearing and engage in independent fact-finding, but rather limit[ed] the *habeas* evidence to that found in the state court record,' our review of its final judgment is plenary." (quoting *Scarborough v. Johnson*, 300 F.3d 302, 305 (3d Cir. 2002))).

With this in mind, we briefly address Wilson's argument that we should not defer to the District Court's finding that he consented to further questioning by Overcash after the completion of the traffic stop. The District Court, in its recitation of the facts of this case, determined that Overcash asked Wilson for permission to ask him about the rental agreement and that Wilson "acquiesced" to this request. As our dissenting colleague points out, however, the bulk of Overcash's testimony indicates that he began asking Wilson questions about his rental car agreement *without* first requesting permission to engage in that line of inquiry. In this light, and because the Court of Common Pleas judge who had the opportunity to observe Overcash's testimony explicitly found that Overcash simply began asking Wilson about the rental car agreement, we conclude that the District Court's factual determination to the contrary cannot stand under either clearly erroneous or *de novo* review.

Because Wilson would prevail on this argument under

7

either standard of review, we reserve for another day decision on whether plenary review is appropriate as to all issues in cases such as this one.[2] Accordingly, we now turn to Wilson's main argument—that the District Court should be reversed because his interaction with Overcash after the conclusion of the traffic stop was not a mere encounter but rather an unlawful seizure.

B. *The District Court's Determination that Wilson was Not Seized*

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Put another way, no seizure has occurred if "a reasonable person would feel free to disregard the police and go about his business, or ultimately whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. . . ." *United States v. Kim*, 27 F.3d 947, 951 (3d Cir. 1994) (internal citations omitted).

Wilson does not contend that his seizure pursuant to the

---

[2]We note that the District Court did not rely on its finding that Wilson had consented to questioning about his rental car agreement in its analysis of whether the Fourth Amendment mandated suppression of the evidence found in Wilson's trunk.

traffic stop was unlawful.[3] As other courts have held, however, "[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000); *see also United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998) ("When the [traffic] stop is over and its purpose served, however, mere questioning by officers, without some indicated restraint, does not amount . . . to . . . a seizure under the Fourth Amendment."). We must therefore determine whether the interaction between Wilson and Overcash after the issuance of the traffic citation and return of Wilson's license and rental agreement was a consensual encounter or a second seizure.

The District Court, comparing the facts of this case to those of *United States v. Drayton*, 536 U.S. 194 (2002), concluded that Wilson was not seized after the conclusion of the traffic stop. In *Drayton*, the Supreme Court held that no seizure had occurred when bus passengers were questioned by plainclothes officers, even though the passengers were in a confined space and the officers displayed their badges, when "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no

---

[3]A routine traffic stop is considered a seizure under the Fourth Amendment. *See Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

9

blocking of exits, no threat, no command, not even an authoritative tone of voice." *Id.* at 204. Wilson argues that his case is distinguishable from *Drayton* because he was isolated on the side of the highway while Overcash questioned him. However, this fact is true of many traffic stops, and the record here shows no circumstances so intimidating that, in combination, they would have caused a reasonable person to perceive that he was not free to leave. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("Where the encounter takes place is one factor, but it is not the only one.").[4]

Overcash was the only officer on the scene. After the issuance of the traffic citation, he returned Wilson's documents

---

[4]Our dissenting colleague argues that *Drayton* should not be applied here because, unlike the bus passengers in *Drayton*, Wilson had already been seized once—by virtue of the traffic stop—before Overcash began questioning him about issues beyond the scope of the traffic stop. This factual distinction does not persuade us to conclude that the factors the Supreme Court deemed relevant to its totality of the circumstances analysis in *Drayton* are not also among the factors we may consider in our totality of the circumstances analysis here. As the dissent emphasizes, the fact that Wilson was questioned after he had already been seized once is a consideration that is relevant to that analysis. But the traffic stop is just one factor that we must weigh against the other circumstances present in this case to determine whether the continued encounter between Wilson and Overcash was a seizure.

and told Wilson that he was free to leave. Wilson answered all of Overcash's subsequent questions without protest. In addition, just as in *Drayton*, there is no indication that Overcash made any intimidating movement or show of force or that he asked Wilson questions using an authoritative tone of voice. Accordingly, we agree with the District Court that, under the totality of the circumstances, Wilson was not seized at any point during his encounter with Overcash subsequent to the issuance of the traffic citation.[5] *Cf. United States v. Bustillos-Munoz*, 235 F.3d 505, 515 (10th Cir. 2000) (holding that detention resulting from a traffic stop ended and a consensual encounter began when state trooper returned suspect's license and registration, informed the suspect that he was free to leave, and then asked whether there were weapons or drugs in the car when there was no evidence "of a coercive show of authority, such as the presence of more than one officer, the display of a weapon,

---

[5]Both Wilson and our dissenting colleague suggest that *Commonwealth v. Freeman*, 757 A.2d 903 (Pa. 2000), the case relied on by the Commonwealth court in suppressing the evidence in the state proceedings, compels the opposite conclusion. We do not believe that *Freeman* is even relevant here, as "[i]t is a general rule that federal . . . courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law." *United States v. Rickus*, 737 F.2d 360, 363 (3d Cir. 1984) (holding, *inter alia*, that federal law applied to defendant's motion to suppress evidence found pursuant to search of the trunk of his car).

11

physical touching by an officer, or his use of a commanding tone of voice indicating that compliance might be compelled") (internal quotation omitted)). We must therefore consider whether Wilson's subsequent consent to the search of the bag in his trunk was voluntary.[6]

C. *The District Court's Determination that Wilson's Consent to the Search of his Bag was Voluntary*

"[A] search conducted pursuant to consent is one of the specifically established exceptions to the warrant requirement." *Givan*, 320 F.3d at 459. The voluntariness of an individual's consent is a question of fact to be determined from all the circumstances. *Id.* "[T]he critical factors comprising a totality of the circumstances inquiry include the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]." *Id.*

The District Court's conclusion that Wilson's consent to

_____

[6]Because we have determined that no seizure occurred, *i.e.*, that Wilson's continued encounter with Overcash was consensual, we need not reach Wilson's argument that Overcash did not have a reasonable articulable suspicion of criminal activity that justified his further questioning. *See Bostick*, 501 U.S. at 433–34 (stating that consensual encounters do not implicate the Fourth Amendment).

the search of his bag was voluntary is amply supported by the record.  As discussed above, Wilson was informed that he was free to leave.  He then cooperated with Overcash throughout the encounter, as he answered all of Overcash's questions, offered to show Overcash his CDs and initiated opening the trunk of his car in order to do so.  As the District Court found, there is no indication in the record that "Wilson was unable by virtue of age or intelligence to understand the situation."  In this context, the District Court hardly erred in finding that Wilson's consent to the search was voluntary.  Overcash's search of Wilson's bag therefore did not violate the Fourth Amendment.

### III. Conclusion

We share our dissenting colleague's concern about the procedural history of this case, particularly because the Government could not represent at argument whether it followed in Wilson's case its usual policy for determining whether cases in which suppression motions were granted in state courts should be re-prosecuted in the federal system.  It is also disturbing that the Department of Justice Guidelines implementing the *Petite* Policy[7] may not have been faithfully

---

[7]"The *Petite* Policy, deriving its name from *Petite v. United States*, [361 U.S. 529 (1960)], 'precludes the initiation or continuation of a federal prosecution, following a prior state or federal prosecution based on substantially the same act(s) or transaction(s),'" absent certain extenuating circumstances. Ellen

followed in this case.[8]

As the dissent acknowledges, however, Department of Justice guidelines and policies do not create enforceable rights for criminal defendants. *See United States v. Gomez*, 237 F.3d 238, 241 n.1 (3d Cir. 2000) (noting that any argument by the defendant that the U.S. Attorneys' Manual created rights entitling him to relief "would be against the weight of judicial authority"); *see also, e.g., United States v. Fernandez*, 231 F.3d

S. Podgor, *Dep't of Justice Guidelines: Balancing "Discretionary Justice,"* 13 Cornell J.L. & Pub. Pol'y 167, 179 (2004) (quoting U.S. Attorneys' Manual § 9–2.031 (2003)); *see also United States v. Grimes*, 641 F.2d 96, 101 & n.17 (3d Cir. 1981) (noting that after *Bartkus v. Illinois*, 359 U.S. 121 (1959), "in which the Supreme Court held that the Double Jeopardy Clause does not bar a state from prosecuting and convicting a defendant who previously has been tried for the same acts in federal court," the Department of Justice "adopted a federal policy" (later known as the *Petite* Policy) that "barred a federal trial following a state prosecution for the same acts 'unless the reasons are compelling'" (quoting Dep't of Justice Press Release (Apr. 6, 1959)).

[8]Our Court has previously noted, however, that the *Petite* Policy may not even be applicable to cases in which a federal prosecution begins after the entry of a *nolle prosse* in state court. *See United States v. Agee*, 597 F.2d 350, 360 n.32 (3d Cir. 1979).

1240, 1246 (9th Cir. 2000) ("[I]t is clear that the USAM [U.S. Attorneys' Manual] does not create any substantive or procedural rights. . . . The USAM explicitly states that '[t]he Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to[,] create any rights, substantive or procedural, enforceable at law by any party in any manner civil or criminal.'" (quoting U.S. Attorneys' Manual § 1–1.100)); *United States v. Blackley*, 167 F.3d 543, 548–49 (D.C. Cir. 1999) (same); *United States v. Myers*, 123 F.3d 350, 356 (6th Cir. 1997) (same); *United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994) (same); *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir. 1990) (same). Thus, although we do not endorse the Department's failure to follow its own policies, particularly in cases such as this one that raise double jeopardy concerns, we are constrained to conclude that any such failure that may have occurred here nevertheless does not mandate (or even allow) relief for Wilson.[9]

Our Court has also previously expressed its dissatisfaction with the *Petite* Policy and, moreover, with the Supreme Court's application of the dual sovereignty principle to hold that prosecution of the same crime in both the federal and state systems does not violate the Double Jeopardy Clause. *See*

---

[9]Indeed, it appears that Wilson's counsel recognized the same constraints, as he made no arguments before us relating to either the Department's apparent failure to follow the *Petite* Policy or to the Double Jeopardy Clause more generally.

15

*generally Grimes*, 641 F.2d at 100–04 (questioning continuing vitality of that jurisprudence particularly because the seminal cases were decided prior to *Benton v. Maryland*, 395 U.S. 784 (1969), which "unqualifiedly held that the Fifth Amendment Double Jeopardy provision applies to the states").  And our dissenting colleague may be correct that the time has come for the Supreme Court to revisit this issue, particularly in light of *Smith v. Massachusetts*, 543 U.S. __, 125 S. Ct. 1129 (2005), in which the Court revisited the scope of the Double Jeopardy Clause.  *See id.* at 1135–37 (holding that the Double Jeopardy Clause was violated when the state trial judge ordered a mid-trial acquittal on one charge and then proceeded to reconsider that acquittal at the end of the case and that "[i]f, after a facially unqualified midtrial dismissal of one count, the trial has proceeded to the defendant's introduction of evidence, the acquittal must be treated as final, unless the availability of reconsideration has been plainly established by pre-existing rule or case authority expressly applicable to midtrial rulings on the sufficiency of the evidence").

Under current precedent, however, there is no double jeopardy bar to a prosecution such as that by the United States against Wilson.  *See Agee*, 597 F.2d at 360 n.32 (noting that any double jeopardy challenge raised by defendant, who was tried in the federal system after his state suppression motion was granted

16

and a *nolle prosse* was entered in the state system, would fail).[10] As we previously wrote in *Grimes*, despite our concerns about such prosecutions, "we do not believe that we are the proper forum to overturn a legal directive from the Supreme Court." 641 F.2d at 104. Thus, notwithstanding the policy issues raised by this case, we conclude that Wilson's prosecution in federal court was proper and that, for the reasons stated in Section II of this opinion, the search of Wilson's bag did not violate the Fourth Amendment. Accordingly, we affirm the District Court's determination.

---

[10]As the District Court held, collateral estoppel also provides no bar to the United States's relitigation of issues relating to the search of Wilson's car that had previously been litigated in the Pennsylvania court. *See Agee*, 597 F.3d at 360 (holding that the doctrine of collateral estoppel did not prevent the United States from relitigating defendant's motion to suppress even though that motion had already been granted by the state court because, *inter alia*, "[t]he United States was not a party to the suppression hearing held in the state court nor were the actions of its officers under consideration in that forum"). In *Agee* we also emphasized that, "'[i]n determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Id*. at 360 n.34.

ALDISERT, <u>Circuit Judge</u>, Dissenting.


Because I agree with the decision of the Pennsylvania Common Pleas Court in suppressing the evidence in this case, I would hold that the District Court erred in deciding that Esco Wilson was not seized for purposes of the Fourth Amendment at the time he consented to the search of his automobile at a traffic stop for speeding on the Pennsylvania Turnpike. Accordingly, I respectfully dissent.

As the majority opinion makes clear, Wilson was arrested by a Pennsylvania State Trooper following a search of his stopped automobile and then prosecuted by the Commonwealth in the Common Pleas Court of Cumberland County where he filed a motion to suppress evidence obtained in the search. The Common Pleas Court granted the motion because the judge determined that Wilson's consent was not an "independent act of free will." This being the only evidence, the prosecution elected to <u>nolle prossequi</u>.[11]

Thereafter, federal authorities arrested Wilson and

---

[11] "<u>Nolle prosequi</u>, filed 9-13-02. M.L. Ebert, Esq. Reason: 6/18/02 Court of Common Pleas suppressed drug evidence and all post-arrest statements thereby rendering this case non-prosecutable. Costs in the amount of $357.50 will be paid by the county. 8-02-02. Edward E. Guido, J." Criminal Docket, Court of Common Pleas of Cumberland County, Docket Number CP-21-CR-0002085-2001, Page 6 of 7.

commenced a prosecution in the United States District Court for the Middle District of Pennsylvania on federal charges arising from the same incident. In response to Wilson's motion to suppress, the government agreed not to offer any new evidence, but stipulated that the federal court could decide the motion solely on the basis of the transcript of the earlier state proceeding.

What appears on the surface to be a blatant exercise of judge shopping, that in theory smacks of double jeopardy, is justified by the government on the basis of what has come to be known as the Petite Policy, a procedure of the Department of Justice ("DOJ" or "the Department") that was severely criticized by this Court in United States v. Grimes, 641 F.2d 96, 100-104 (3d Cir. 1981) (Adams and Sloviter, Circuit Judges, Knox, District Judge).

The Petite Policy allows the Department, in certain circumstances, to institute a federal prosecution based on substantially the same act(s) or transaction(s) involved in a prior state or federal proceeding where the defendant has previously prevailed. See Rinaldi v. United States, 434 U.S. 22, 27 (1977); Petite v. United States, 361 U.S. 529 (1960).

I.

At oral argument in this case, the court asked the government lawyer if the Justice Department gave the local federal prosecutor authority to commence a federal prosecution. This colloquy followed:

> AUSA: [The Petite] Policy provides that there are various circumstances

19

under which the Department will approve a subsequent federal prosecution on the same facts as a state prosecution and one of the circumstances under which the Department will do so is where there has been a suppression of evidence based on state law or on an erroneous interpretation of federal law by a state court.

COURT:          And that was done here? Your office received the approval of the DOJ?

AUSA:           I do not know whether that was done here.

COURT:          Why is this case here? <u>Freedman</u> [the Pennsylvania Supreme Court Case relied on by the Pennsylvania Court of Common Pleas] involved the interpretation of federal constitutional law. What makes this case extremely unusual is that I have never seen a procedure where the federal prosecution proceeds, but then relies exclusively on the

20

transcript of the state proceeding? Are you familiar with any other precedent?

AUSA: I have done it many times myself and it happens frequently. It does not happen all the time but it does happen and it happens where we feel that there was an injustice done.

I am troubled by a policy that automatically triggers a federal prosecution merely because "there has been a suppression of evidence based on state law or on an erroneous interpretation of federal law by a state court." I believe this policy generates serious problems. It increases the caseload in federal courts, runs counter to modern concepts of federalism, denigrates the quality of the state-court system, trial and appellate, demeans the professionalism of state-court judges who have more experience, indeed much more experience, in deciding federal constitutional questions in criminal proceedings than federal judges and in view of the recent teachings of Smith v. Massachusetts, 543 U.S. ___, 125 S.Ct. 1129 (2005), probably violates the Double Jeopardy Clause of the United States Constitution.

The very admission in open court that the federal government will initiate a new prosecution in cases where state courts suppress evidence has a pernicious effect on the rights of

state-court defendants seeking to vindicate Fourth Amendment rights. The federal government's message to state judges is clear: "Do not suppress evidence. If you do, we'll institute a new federal prosecution on the same facts even though the investigation and arrest were made by state authorities and the state conducted the prosecution." This policy allows the United States, in effect, to use federal courts to review any state judge's federal constitutionally-based decision on a motion to dismiss.

To me, this is appalling.

I express the views that follow for the purpose of: (1) inviting the Supreme Court to re-examine its older cases on the Double Jeopardy Clause in light of its cases making the Bill of Rights applicable to state prosecutions by means of the Fourteenth Amendment; and (2) directing the attention of Congress to this practice.

II.

This practice of instituting a federal prosecution when "there has been a suppression of evidence based on state law or on an erroneous interpretation of federal law by a state court," which apparently "happens frequently" is not in accord with the Department's own guidelines implementing the Petite Policy. (See Oral Argument (quoted in full above).) First, the guidelines require, as a procedural prerequisite to initiating a federal prosecution subsequent to a state prosecution, approval "by the appropriate Assistant Attorney General." U.S. Dep't of Justice, United States Attorneys' Manual § 9- 2.031 (1997). There is no indication that approval was given in this case, and it seems unlikely that approval was given because the AUSA arguing the

22

appeal did not know whether it had been given or not.

Second, and more importantly, the guidelines require that a "substantial federal interest" be involved which was "unvindicated" at the state level and which can be effectively vindicated at the federal level through a "conviction by an unbiased trier of fact." Id. The determination about whether a federal interest is involved is to be made on a "case-by-case" basis with a presumption "that a prior prosecution, regardless of result, has vindicated the relevant state interest." Id.

Initially, I note that the explanation of the policy by the AUSA at oral argument seems at odds with a careful "case-by-case" approach. More fundamentally, the following inquiries expose what I take to be unwarranted assumptions, implicit in the Department's guidelines, about what it takes to vindicate a federal interest: (1) Whether the federal interest in prosecuting drug dealers is exclusively a federal interest, or, if the interest is not exclusively federal, whether federal law promotes a far more effective vindication of the interest than the state law designed to vindicate the same interest; and (2) Whether federal judges have a superior competence, by reason of more experience, to preside over criminal cases which present constitutional issues. My answers, set forth below, lead me to question not only the conformity of the procedure followed in this case with the Department's own guidelines,[12] but also the continuing vitality

_____

[12] I am quick to recognize that this Court in Grimes, and all other United States Courts of Appeals that have considered the question recognize our inability to invoke the Department's policy as a bar to federal prosecution. See, e.g., United States v.

of the <u>Petite</u> Policy itself.

A.

It is helpful first to compare the federal and state statutes and sentences for the charge of distributing and possessing with intent to distribute a significant quantity of cocaine. In the District Court, Wilson filed a conditional plea of guilty to 21 U.S.C. § 841(a)(1) for possession with intent to distribute more than 500 grams of cocaine. After his motion to suppress was denied, he was fined $300 and sent to jail for five years.

Pennsylvania law similarly prohibits "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance," such as cocaine. 35 Pa. Stat. Ann. § 780-113(a)(30) (2003). Sentencing for violation of 35 P.S. § 780-113(a)(30) is governed by 18 P.S. § 7508(a)(2). Where the offense involves at least 100 grams of cocaine, it provides for a mandatory minimum sentence of five years in prison and a fine

---

<u>Snell</u>, 592 F.2d 1083 (9th Cir. 1979); <u>United States v. Howard</u>, 590 F.2d 564 (4th Cir. 1979); <u>United States v. Frederick</u>, 583 F.2d 273 (6th Cir. 1978); <u>United States v. Thompson</u>, 579 F.2d 1184 (l0th Cir. 1978) (en banc); <u>United States v. Wallace</u>, 578 F.2d 735 (5th Cir. 1978); <u>United States v. Nelligan</u>, 573 F.2d 251 (5th Cir. 1978); <u>United States v. Hutul</u>, 416 F.2d 607 (7th Cir. 1969). The Supreme Court, in analogous contexts, has concluded that Department policies governing its internal operations do not create rights which may be enforced by defendants against the Department. <u>See</u> <u>United States v. Caceres</u>, 440 U.S. 471 (1979); <u>Sullivan v. United States</u>, 348 U.S. 170 (1954).

24

of $25,000 for first time offenders and seven years and a $50,000 fine for repeat offenders. § 7508(a)(2)(iii). The Pennsylvania law seems to punish drug dealers more effectively, or at least more forcefully, than the federal law.

If the federal interest is in prosecuting drug dealers, clearly a prosecution under the state statute would vindicate the relevant federal interest. I refuse to accept the notion that the federal interest is to demand <u>convictions</u> rather than <u>prosecutions</u>. I see nothing in the Constitution or any statute that so defines our federal interest.

There appears to be no reasonable justification for federal prosecutors becoming modern day Girolamo Savonarolas and insisting that because a cocaine dealer in a state court was turned loose after a Fourth Amendment hearing, they must prosecute again in order to combat wickedness and spread holiness of life. If we can agree that the federal interest is to insure that drug dealers be prosecuted, I submit that every state in this Nation has a similar interest, and this leads to the next question: Are state judges competent to try drug cases in state criminal courts?

B.

The brute fact is that state-court trial judges have more experience than federal judges in deciding federal constitutional issues that arise in criminal prosecutions. For example, in 2002, some **15.5 million** criminal cases were filed

25

in state trial courts,[13] while in the federal district courts there were 67,000 in 2003 and 70,642 in 2004.[14]

The ratio of superiority of experience of state judges **is approximately 2250 to 1**. This means that, as a group, state judges had 2250 criminal cases to every **one** of their federal counterparts.

In a more immediate locale, Pennsylvania Common Pleas Court judges handled 155,049 criminal cases in 2002.[15] The federal district judges in the three federal judicial districts

---

[13] Examining the Work of the State Courts, 2003, (National Center for State Courts) 38; see also id. at 40 (Table for 2002, state by state except Mississippi, Oklahoma and Wyoming).

[14] Judicial Business of the United States Courts: 2003 Annual Report of the Director [hereinafter "Report"], Table D, available at http://www.uscourts.gov/judbus2003/appendices/d.pdf (as of Mar. 10, 2005).

[15] 2002 Caseload Statistics of the Unified Judicial System of Pennsylvania 9, available at http://www.courts.state.pa.us/Index/Aopc/Research/caseloads/ 2002Report.pdf (as of Mar. 10, 2005). The 2003 figure is 153,362. 2003 Caseload Statistics of the Unified Judicial System of Pennsylvania 9, available at http://www.courts.state.pa.us/Index/Aopc/Research/caseloads/ 2003report.pdf (as of Mar. 10, 2005). In Philadelphia alone, there were 15,092 new filings in 2003. Id. at 12.

in Pennsylvania handled only 1394.[16] This means that, as a group, Pennsylvania state judges had approximately 111 criminal cases to every **one** of their federal counterparts. In the district courts of the entire Third Judicial Circuit in 2002 there were 2939 criminal filings.[17]

To be sure, at the time the Supreme Court put its imprimatur on the Petite Policy, state judges had little or no experience with federal constitutional issues.

These cases were decided at a time when Fifth Amendment Double Jeopardy did not bind the states. When the Court decided Abbate v. Illinois, 359 U.S. 187, 194 (1959), and held that "[t]he Fifth Amendment, like all other guaranties in the first eight amendments, applies only to proceedings by the federal government, . . . and the double jeopardy therein forbidden is a second prosecution after a first trial for the same offense under the same authority," Benton v. Maryland, 395 U.S. 784 (1969), had not yet applied the Fifth Amendment Double Jeopardy Clause to the states.

A popular saying seems appropriate here: "We've come a long way, baby."

The time has come for the Supreme Court to revisit the issue, or for Congress to take ameliorative actions on the basis of the empirical data set forth above; data that demonstrates the overwhelming participation by state judges in criminal cases

---

[16] Report, supra, note 2.

[17] Id.

27

involving federal issues.

A brief list of the significant recurring federal constitutional issues facing state judges every day includes: Faretta v. California, 422 U.S. 806 (1975) (right to proceed without counsel); Bruton v. United States, 391 U.S. 123 (1968) (limited use of co-defendant's confession); United States v. Wade, 388 U.S. 218 (1967) (right to counsel during post-indictment lineup identification); Miranda v. Arizona, 384 U.S. 436 (1966) (right to counsel during custodial interrogation); Brady v. Maryland, 373 U.S. 83 (1963) (right to exculpatory information in possession of prosecutor); Gideon v. Wainwright, 372 U.S. 335 (1963) (right to court-appointed counsel); Mapp v. Ohio, 367 U.S. 643 (1961) (search and seizure).

III.

My analysis of the double jeopardy problems which inhere in the Department's Petite Policy begins with endorsement of what this Court said in Grimes, and I incorporate by reference the discussion set forth therein in Part II. See 641 F.2d at 100-104. Succinctly, this Court is of the view that "permitting successive state-federal prosecutions for the same act may be viewed as inconsistent with what is a most ancient principle in western jurisprudence that a government may not place twice a person in jeopardy for the same offense." Id. at 100. We noted that the predicate of the seminal case legitimating this policy, Bartkus v. Illinois, 359 U.S. 121 (1959), was that the Fifth Amendment Double Jeopardy Clause did not bind the states. Subsequently, Benton unqualifiedly held that the provision does apply to the states. 395 U.S. at 794. After a discussion of Supreme Court cases that followed Bartkus and

28

Abbate, we stated: "Whenever a constitutional provision is equally enforceable against the state and federal governments, it would appear inconsistent to allow the parallel actions of state and federal officials to produce results which would be constitutionally impermissible if accomplished by either jurisdiction alone." Grimes, 641 F.2d at 102. "The ban against double jeopardy is not against twice being punished, but against twice being put in jeopardy." William B. Lockhart, Yale Kamisar, Jesse H. Choper, Constitutional Law 696 n.a (1970) (citing Downum v. United States, 372 U.S. 734 (1963)).

A.

The Supreme Court has recently reconsidered the scope of double jeopardy protection in another context in Smith v. Massachusetts. In determining that double jeopardy attaches mid-trial where a judge ruled in favor of the defendant on a motion for a required finding of not guilty on one of the charged offenses, the Court considered it important that "the facts of this case gave the petitioner no reason to doubt the finality of the state court's ruling." Smith, 125 S.Ct. at 1135. The same is true here. I find no indication in the record that Wilson was forewarned that even if he prevailed in his state proceedings, he would still have to face a second federal prosecution.

More importantly, the Court stated:

Our cases have made a **single exception** to the principle that acquittal by judge precludes reexamination of guilt no less than acquittal by jury: When a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a

29

prosecution appeal to reinstate the jury verdict of guilty. <u>United States v. Wilson</u>, 420 U.S. 332, 352-353, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). But if the prosecution has not yet obtained a conviction, further proceedings to secure one are impermissible: "[S]ubjecting the defendant to postacquittal factfinding proceedings going to guilt or innocence violates the Double Jeopardy Clause." <u>Smalis v. Pennsylvania</u>, 476 U.S. 140, 145, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986).

<u>Id.</u> at 1134 (emphasis added).

B.

Moreover, there has been action by Congress subsequent to this Court's 1981 decision in <u>Grimes</u> that has relevance here.

In 1996, Congress amended 28 U.S.C. § 2254 to provide:

> (d.) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

The Court has explained: "Congress specifically used the word 'unreasonable,' and not a term like 'erroneous' or 'incorrect.' Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000); see also Bell v. Cone, 535 U.S. 685, 694 (2002) ("The focus of the latter inquiry is on whether the state court's application of **clearly established** federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one.") (emphasis added); see also Brown v. Payton, 544 U.S. __, 125 S.Ct. 1432 (2005) (recent decision of the United States Supreme Court affirming this principle).

There are important similarities between: (1) the statutory presumption in habeas cases at § 2254(d) that the state proceedings are presumed correct; and (2) the DOJ's Petite Policy that presumes that a prior prosecution, regardless of the result, has vindicated the relevant federal interest. U.S. Dep't of Justice, United States Attorneys' Manual § 9- 2.031 (1997).

Putting aside the question of double jeopardy, it seems to me that if we are to put a **defendant** to the expense and agony of a second trial under Petite, the government should be put to the same test that Congress now requires of a habeas petitioner under § 2254. The government should have to show that the state court's application of clearly-established federal law is objectively unreasonable, rather than merely incorrect.

31

Absent a re-examination by the Supreme Court, it would take Congressional action to replace the policy described at oral argument in this case which allows a subsequent federal prosecution "where there has been a suppression of evidence based on state law or on an erroneous interpretation of federal law by a state court."

I now turn to the constitutional issues presented in the case at bar.

IV.

The District Court erred in determining that Pennsylvania State Trooper Overcash obtained effective consent from Esco Wilson for the search of his bag and therefore erred in its denial of Wilson's motion to suppress the evidence obtained from that search. This conclusion follows from a determination that Wilson was not seized for purposes of the Fourth Amendment. I begin with a discussion of the standard of review.

The government urges that a number of questions of fact and mixed questions of law and fact are contained in the ultimate legal issue before us. It contends that these questions of fact should be subject to a review for clear error by this Court.

I agree that, generally, factual questions and factual components of mixed questions are subject to a clear error standard of review. I also agree with the government's specific determination of which issues are factual and the cases which support this determination. See United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003); United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002); United States v. Coggins, 986 F.2d 651,

32

653-654 (3d Cir. 1993).

There is an important factual difference between the cases cited by the government in support of its preferred clearly erroneous standard of review and the case at bar. In each of the cited cases, the district court judge was present during the proceeding that produced factual evidence. The judge smelled the smoke of battle and was therefore in a much better position to make factual determinations than an appellate judge who merely reviews a paper record.

> Face to face with living witnesses the original trier of facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth . . . . How can we say the judge is wrong? We never saw the witnesses . . . . To the sophistication and sagacity of the trial judge the law confines the duty of appraisal.

Wainwright v. Witt, 469 U.S. 412, 434 (1985) (quoting Marshall v. Lonberger, 459 U.S. 422, 432 (1983) and Boyd v. Boyd, 169 N.E. 632, 634 (N.Y. 1930)).

In the case before us, the district judge was not there. He relied entirely on transcript evidence from the suppression hearing in the Pennsylvania Court of Common Pleas. This departure from orthodox district court suppression procedures is relevant because the very reason we defer to factual findings made at the trial-court level is not present in this case. This Court is in exactly the same position as the District Court.

33

Collectively, three judges of this Court can read the written transcript of the state suppression hearing, the briefs of the parties and question the lawyers during oral argument. Judge Guido of the Cumberland County Court of Common Pleas was in a better position to make factual determinations, but we are not reviewing the state court's grant of Wilson's motion to suppress. We must review the order of the District Court.

I would exercise plenary review of factual as well as legal determinations made by the District Court because the unique circumstances here make the reasons for the normal clearly erroneous standard inoperative.

V.

This Court has not heretofore dealt directly with the issue presented here: When questioning occurs after the purpose of a traffic stop has been completed and the officer states that a person is free to leave, under what circumstances does a second seizure arise requiring probable cause distinct from that which justified the initial stop?

Here, the panel is plowing new furrows in this Court. And I am quick to admit that this is a close issue over which reasonable minds may differ.

I conclude that the District Court erred in determining that Pennsylvania State Trooper Overcash obtained effective consent from Wilson for the search of his bag. I believe it erred in denying Wilson's motion to suppress the evidence obtained from that search. Supporting these conclusions is my disagreement with the District Court's decision that Wilson was not seized for purposes of the Fourth Amendment when the

34

consent was given.

A.

I start with the testimony of Trooper Overcash:

Q. Go ahead. What did you do with that citation?

A. Well, upon completing that citation, I examined this rental agreement and observed that it was actually to be returned by August 17th, 2001. I did conduct an NCIC CLEAN check to see if the vehicle was stolen. That was negative. Upon completing that citation and examining the rental unit, I did return to Mr. Wilson's vehicle.

Q. Did you issue him a citation?

A. Yes, I did.

* * * * *

Q. What happened next, Trooper?

A. I issued the traffic citation to Mr. Wilson outside the vehicle. Upon issuing the citation, **I advised him he was free to leave**. He took a few steps towards his vehicle, and then I asked him a question about the rental agreement being expired, and he responded. He related that he usually rented them for a month,

35

that he did a lot of traveling. I asked him what kind of work he did. He related [sic] he sold master compact disks to music stores for approximately $500.00.

(Transcript of hearing at 8-10 (emphasis added).)

Thereafter, Trooper Overcash was asked "What happened next?" by the prosecuting attorney 14 times in four pages of testimony. (Id. at 10-14.) Fourteen answers by the Trooper related to his seeking information from Wilson after he had "advised [Wilson] that he was free to leave" at the conclusion of the traffic stop.

I view as instructive the Common Pleas Court judge's finding that Trooper Overcash simply began asking about the rental agreement. It was the state court judge and not the district judge who was able to observe Trooper Overcash's testimony first hand. (See Op. of the Ct. of Common Pleas at 84.) Because of the unique posture of this case which leads me to apply a completely de novo standard of review, I would credit the state court finding over the opposite finding made by the district court judge.

B.

United States v. Mendenhall, 446 U.S. 544 (1980), instructs that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 554. Mendenhall

36

set forth "[e]xamples of circumstances that might indicate a seizure" including "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id.

In determining that Wilson was not seized for purposes of the Fourth Amendment, the government and the majority rely on United States v. Drayton, 536 U.S. 194 (2002). In that case, three plainclothes police officers with visible badges and concealed weapons boarded a bus as part of a routine drug and weapons interdiction. Id. at 197. One officer stood at the rear of the bus, a second stood at the front while a third officer went from passenger to passenger explaining his purpose and seeking permission to search their luggage. Id. at 197-198. The officers all made an effort not to block the entrance or exit of the bus. Id. The Court focused on coercion by force. It determined that because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice," there was also no seizure for purposes of the Fourth Amendment. Id. at 204. Drayton focused on these factors not as a test for determining whether a seizure had taken place, but rather as factually relevant inquiries in determining whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Id. at 202.

The facts in this case are quite different from those in Drayton. Wilson was not one of many passengers on a bus who were all being politely asked for permission to search their bags.

37

Instead, he had been pulled over, had his license, registration and rental agreement taken from him and was then ordered out of his car to receive a citation for speeding. None of this interaction was voluntary in nature.

All of the interaction was made in the context of a legitimate seizure for the purpose of issuing a speeding citation; a legitimate seizure that ended when Trooper Overcash told Wilson he was free to leave. Unlike the situation in <u>Drayton</u>, where the bus passengers had **not** been seized prior to the onset of questioning, Wilson had been seized for the speeding violation.

To hold that the teachings of <u>Drayton</u> applies is to mix apples and oranges.

In the case at bar, after being told he was free to leave, Wilson was immediately asked another question that had nothing to do with a speeding violation, the only purpose of the original seizure. He was asked a question about his rental lease, at a time when the Trooper had already learned that the car was not stolen. He was then asked where he was going, and after he responded, the Trooper walked to the other side of the car and asked the two passengers where they were going. Then, the Trooper went to his car and radioed for backup.

In this factual context, the critical question is whether a reasonable person **at this time** would feel free to: (1) decline to answer the officer's questions; (2) re-enter his car; (3) say "sayonara" to the cop and drive away.

The District Court determined that, as in <u>Drayton</u>, there was no coercive force present in Trooper Overcash's encounter

38

with Wilson, and by virtue of this conclusion, determined that a reasonable person in this circumstance would have felt free to decline to answer the officer's questions and drive away. In reaching this conclusion, the District Court focused exclusively on what took place after Trooper Overcash told Wilson he was free to leave.

For Fourth Amendment seizure purposes, I agree with the District Court: Trooper Overcash's statement that Wilson was free to leave effectively ended the seizure that was incident to the traffic stop. Moreover, this fact constitutes the basic jurisprudential distinction between the facts in this case and those in Drayton.

Yet, we are not precluded from considering the potentially coercive effect which the force used during that traffic stop, before Wilson was told he was free to leave, may have had on the subsequent interaction between Trooper Overcash and Wilson. In addition, the Trooper's statement that Wilson was free to go was framed by an authoritarian context.

The government cites a series of cases from our sister United States Courts of Appeals which are more similar factually than is Drayton to the case at bar.[18] Each makes clear

---

[18] See United States v. Taverna, 348 F.3d 873, 877-879 (10th Cir. 2003) (determining that a defendant was not seized for purposes of the Fourth Amendment where the defendant, after receiving a traffic citation, was walking back to his vehicle when the police officer hollered after him and asked if he could visit about things, proceeded to ask about drugs and guns and finally obtained permission to search the vehicle after explaining

that a seizure pursuant to a traffic stop ends when the person stopped is told they are free to go, or have their documents returned to them. Although each of the cited cases held that subsequent interaction between the defendant subjected to the traffic stop and the police officer was consensual, every one of these cases contemplates the possibility that a show of authority **could** result in a second seizure. In each of these cases, the follow-up question which re-initiates the conversation after the traffic stop seizure is general and non-threatening to a law abiding person. In contrast, Wilson was asked a very specific question about the expiration of his rental agreement which

---

that the defendant could refuse); United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) (determining that a defendant was not seized when the police officer asked about travel plans after having concluded the initial traffic stop by handing the defendant's documents back to him); United States v. Bustillos-Munoz, 235 F.3d 505, 514-515 (10th Cir. 2000) (determining that there was no coercive show of authority, and therefore no seizure, when, as the defendant was walking back to his car, the officer asked if he had any guns or drugs in his car and the defendant responded no; the officer then asked for and obtained permission to search the vehicle and found drugs); United States v. Sullivan, 138 F.3d 126, 133-134 (4th Cir. 1998) (determining that defendant was not seized for purposes of the Fourth Amendment where, after having his license and registration returned to him, the defendant was asked whether he had anything illegal in his car and when the defendant did not answer, the officer repeated the question several times yielding an admission by the defendant that he had a gun in the car).

could be easily perceived as accusatory and threatening even by an innocent law abiding person.

I find the government's reliance on Ohio v. Robinette, 519 U.S. 33 (1996), largely unhelpful. Although it is true that Robinette is factually similar to the case before us, I do not read it as supporting the government's position. Rather, I read it as rejecting any per se rule that would require police officers to inform persons that they are free to leave after a valid detention before attempting to engage in a consensual interrogation. Id. at 36, 39-40. Robinette reaffirmed a factually-based reasonableness test and remanded to the Ohio Supreme Court to decide the case using a reasonableness test instead of a per se rule. Id. at 40. In interpreting the guidance of the United States Supreme Court on remand, the Ohio State Supreme Court determined that, based on the totality of the circumstances, the transition between the exercise of authority involved in the seizure pursuant to a traffic stop and the seeking of permission to search the vehicle had been so seamless that the officer's questioning was impliedly coercive. See State v. Robinette, 685 N.E.2d 762, 770-772 (Ohio 1997).

In Commonwealth v. Freeman, 757 A.2d 903, 905 (Pa. 2000), the case relied upon by the Common Pleas Court in this case, Freeman was pulled over and issued a warning for improper lane changes and windshield obstructions. After the officer had issued the warning and returned Freeman's documents, he told her she was free to go and went back to his car. Id. The officer then got out of his car and returned to Freeman's car, began questioning her and her passengers, ordered her out of the car and eventually obtained permission to search the car and found drugs. Id. The court employed the test

41

which has been articulated by the United States Supreme Court and found that based on the totality of the circumstances, a reasonable person would conclude that the officer's previous statement indicating she was free to leave was no longer operative and therefore a second seizure had taken place. Id. at 907-908.

In Givan, a factually similar case, we expressed doubt about whether the second encounter was a seizure for purposes of the Fourth Amendment but decided the case on a different basis: Even assuming that the defendant was seized, there was "reasonable and articulable suspicion of illegal activity sufficient to extend the stop." 320 F.3d at 458. Our doubt in Givan sheds little light on the present case in view of some relevant factual differences. In Givan, the officer asked the driver of the car if he would mind answering a few questions before he began his questioning and the officer also explained that consent to the search had to be voluntary and was not required. Id. at 459.

Our survey of the case law uncovers no case from our own Court or the Supreme Court that is specifically controlling.

Although this is a very close case, I conclude that, looking at the totality of the circumstances, a reasonable person in Wilson's position would not feel free to refuse to answer Trooper Overcash's questions or get in the car and drive away. To be sure, Trooper Overcash's instruction that Wilson was free to leave must be considered as a fact tending to support the government's contention that this was a mere encounter, rather than a seizure. I conclude, however, that the overall context in which the interaction between the Trooper and Wilson occurred

42

outweighs this fact. As was the case in <u>Freeman</u>, Wilson had just been subject to a series of authoritative, albeit legitimate, commands by Trooper Overcash: being pulled over; required to produce documents; required to exit his vehicle and proceed to the rear of the vehicle. Then, almost immediately after being told he could leave, he was asked a very specific question which a reasonable person could take as an accusation of some kind of wrongdoing (namely possessing a vehicle illegally) followed by a demand to know his interim, mediate or ultimate destination. This questioning was serious enough to warrant a call for backup. Although reasonableness is the test, it is beyond cavil that at this moment Trooper Overcash considered that he had made a second seizure of Wilson.

I, therefore, conclude that the District Court erred in determining that Wilson was not seized for purposes of the Fourth Amendment.

## VI.

The Majority has based its holding on their conclusion that Wilson was not seized for purposes of the Fourth Amendment when he consented to the search of his bag. I have expressed my disagreement with this conclusion. I will not comment on the government's alternative theories which, in my view, are also flawed.

**\* \* \* \* \***

The teachings of <u>Massachusetts v. Smith</u> cast serious doubt on, if not completely vitiate, the continuing vitality of the <u>Petite</u> Policy. Additionally, as a matter of public policy, <u>Petite</u> fails to give proper respect to the ability of state law and state

43

judges to vindicate federal interests. I am asking the Clerk to forward a copy of this dissenting opinion to the respective chairs of the Judiciary Committees of the United States House of Representatives and the United States Senate with a recommendation that they determine whether legislative action is needed.

On the merits of the case at bar, I would reverse the judgment of the District Court.

Accordingly, with respect, I dissent.