**UNITED STATES of America,
Appellant**

v.

**Thomas J. SMITH.**

No. 08–3642.

United States Court of Appeals,
Third Circuit.

Argued April 20, 2009.

Filed: July 30, 2009.

---

12. We do not mean to suggest that such a potential violation necessarily would be of constitutional dimensions.

Keith M. Rosen, Esquire, (Argued), John C. Snyder, Esquire, Office of United States Attorney, Wilmington, DE, Attorneys for Appellant.

Keir Bradford, Esquire, (Argued), Edson A. Bostic, Esquire, Tieffa N. Harper, Esquire, Office of Federal Public Defender, Wilmington, DE, Attorneys for Appellee.

Before SCIRICA, Chief Judge, SLOVITER and FISHER, Circuit Judges.

OPINION OF THE COURT

SCIRICA, Chief Judge.

In this appeal, arising under the Fourth Amendment, we consider what constitutes submission to a police officer's authority. Defendant Thomas J. Smith was arrested and charged with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of possession of cocaine base, in violation of 21 U.S.C. § 844(a). Smith filed a motion to suppress evidence and statements. After an evidentiary hearing, the District Court granted the motion, finding the officers had "stopped" Smith without the constitutionally required "reasonable cause." *See Ter-*

*ry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Government appealed, contending the District Court erred when it held Smith was seized prior to his physical contact with the officers. We agree and will accordingly reverse and remand.

## I.

Neither party disputes the following facts as determined by the District Court. On January 8, 2008, at approximately 3:15 a.m., Officers Rinehart and Muziol, in full uniform in a fully marked police vehicle, were conducting a high-visibility patrol in the 16th District of Wilmington, Delaware, an area of recent high crime activity. The police officers were under orders from their lieutenant to "stop and identify anyone that was out walking in that area, and to just basically make … [their] presence known." The officers saw Smith walking down the street, and pulled over about one foot away from him to speak with him and ascertain his identity and where he was going.

Officer Muziol leaned out the window of the patrol vehicle and said to Smith, "Can I talk to you for a second?" Smith stopped walking and turned at a 45 degree angle towards the car, seemingly agreeing to speak with the officers. Officer Muziol asked if Smith had any identification, to which he replied no. The officer asked Smith where he was heading and he replied he was going to his girl's house. Officer Muziol then asked the location of his girl's house and Smith responded, "I am heading to my girl's house." Officer Muziol repeated the question "where is your girl's house?" several times, and

Smith always responded by saying he was going to his girl's house.

Officer Muziol then asked Smith to place his hands on the hood of the patrol vehicle so the officers could "speak with him further." [1] Smith took two steps toward the vehicle, at which point one or both of the officers began to open their car doors. At the sound of the car door opening, Smith turned and ran. As both officers were still in the vehicle, they pursued Smith by car. Smith attempted to evade the officers by crossing a parking lot and began to scale a fence. Officer Rinehart exited the vehicle and began pursuing Smith by foot. Smith abandoned climbing the fence and began to run through the parking lot again, at which point Officer Rinehart observed a firearm fall from Smith's waistband. Smith dropped to the ground a short distance later after one of the officers verbally commanded him to stop. But Smith resisted arrest and Officer Rinehart gave him a stun blow to the back of the head to gain control, after which he took Smith into custody. Officer Rinehart returned to the area where he had observed the firearm fall and retrieved a semiautomatic handgun. Before he was processed, Smith voluntarily admitted that he possessed approximately one gram of crack cocaine.

The District Court found that Smith was seized when Officer Muziol repeatedly asked him the same question, and in the alternative, he was also seized when, responding to the officer's show of authority, Smith submitted and took two steps towards the hood of the car, before fleeing. The District Court found that the initial submission was "more than momentary, and not undercut by his subsequent at-

---

**1.** Officer Rinehart explained at the suppression hearing that Officer Muziol asked Smith to place his hands on the hood "[t]o ascertain his identification and conduct further identification checks, to see where he was heading, because his answers to what Officer Muziol was asking and his overall body language … was enough to have him stopped and put his hands on the hood of the car."

tempt to flee the officers." "Because the officers did not have reasonable suspicion that criminal activity was afoot when they seized Smith," the District Court found, the firearm, cocaine, and subsequent statements made by Smith were all fruits of the illegal seizure and must be suppressed. *See generally Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (requiring the exclusion and suppression of evidence gathered as a result of most unlawful searches or seizures). The District Court granted Smith's motion to suppress all physical evidence and statements stemming from his encounter with the police.[2]

## II.

■■■ The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. "The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (internal quotation marks omitted). But not every interaction between a police officer and a citizen is protected by the Fourth Amendment. An encounter "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.... 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868); *see also California v.*

*Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). "Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *Mendenhall,* 446 U.S. at 553, 100 S.Ct. 1870. Yet "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton,* 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). In fact, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, [and] ask for identification" without running afoul of the Fourth Amendment's prohibitions. *Id.* at 201, 122 S.Ct. 2105.

■■■ Whether an encounter with a police officer constitutes a search and/or seizure under the Fourth Amendment requires consideration of "all the circumstances surrounding the encounter." *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382. Any inquiry into an alleged seizure must begin by determining when the seizure occurred. *See United States v. Torres,* 534 F.3d 207, 210 (3d Cir.2008) ("The initial step of a Fourth Amendment suppression analysis requires us to determine the timing of the seizure."). The timing of the seizure is significant—if the seizure occurred after suspicious behavior such as flight, this factors into our analysis of whether there was reasonable suspicion to justify the seizure. But if the seizure occurred before the flight, as the District Court found here, then the flight "plays no role in the reasonable suspicion analysis." *United States v. Brown,* 448 F.3d

---

**2.** The District Court had jurisdiction under 18 U.S.C. § 3231 to hear this motion and we have jurisdiction pursuant to 18 U.S.C. § 3731. When reviewing a suppression order, we exercise plenary review over the District Court's legal conclusions and evaluate its factual findings for clear error. *United States v. Torres,* 534 F.3d 207, 209 (3d Cir.2008).

239, 245 (3d Cir.2006). As such, any seizure inquiry has two steps: Was there in fact a seizure? If so, was that seizure reasonable?

■ The Supreme Court provides us with guidance. In *Mendenhall*, the Court listed several factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554, 100 S.Ct. 1870. In *Hodari D.*, the Court provided further clarification, holding that the *Mendenhall* test was "a necessary, but not a sufficient condition for seizure—or, more precisely, for seizure effected through a 'show of authority.'" 499 U.S. at 628, 111 S.Ct. 1547 (emphases omitted). In *Hodari D.*, the Court held that a seizure does *not* occur when the subject does not yield to a show of authority. 499 U.S. at 626, 111 S.Ct. 1547. To be clear, a seizure "requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority." *Id.* The simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized.

■ Furthermore, "[w]hen the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not." *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405, 168 L.Ed.2d 132 (2007) (discussing the application of the *Mendenhall* test after *Hodari D.*). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen

perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547.

### III.

■ As noted, a law enforcement officer's approaching a person and asking him questions on the street does not, without more, effectuate a seizure. *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir.2005). The District Court found that Smith was seized the moment Officer Muziol "began to repeat the question 'Where is your girl's house' to Smith ... [because] neither Smith, nor a reasonable person[,] would feel free to ignore Muziol's question or terminate the encounter with the officers."

The District Court relied upon *Johnson v. Campbell*, 332 F.3d 199 (3d Cir.2003). In *Johnson*, police officer Campbell, after receiving a complaint from a nervous motel worker, approached Johnson, who was sitting in the front seat of a van in the motel parking lot and gestured for Johnson to roll down his window. He then told Johnson he was being detained and again asked him to roll down his window. *Id.* at 203. Johnson refused to comply with the officer's request. Only after being asked a few times to roll down the window did he do so, rolling it down a few inches. *Id.* Campbell then asked for identification and again Johnson refused to comply. After more discussion, and Johnson's use of a profanity, he was arrested for disorderly conduct and taken to the police station and detained for less than an hour. He was released without being charged.

Johnson filed suit under 42 U.S.C. § 1983 alleging the stop and arrest violated his Fourth Amendment rights. On appeal, we agreed and found for Johnson as a matter of law. 332 F.3d at 215. We

identified the officer's persistent request to roll down the window, which continued even after Johnson made the choice not to acquiesce, as a defining feature which turned the encounter into a seizure. *Id.* at 206. At that moment, it was evident to a reasonable person "that Johnson was not free to ignore him and would not be left alone until he complied." *Id.* Furthermore, the officer told Johnson he was being detained.

Although there are some similarities, *Johnson* is distinguishable. A reasonable person, in Smith's position, would have felt free to terminate the encounter with the officers. In contrast to *Johnson*, Smith's initial and subsequent responses were not clearly a refusal to consensually engage. As Officer Rinehart testified, "we didn't know what was going on, why he kept giving us the same answer to different questions." It was reasonable for the police officers to re-state the question as they had been given a nonsensical answer.[3] There was no overt indication the questioning was not part of a consensual encounter between the officer and Smith as there was in *Johnson*.

At this point in the encounter the police officers had not made any show of authority while questioning Smith nor had they told Smith he was being detained. In *Johnson*, the police officer advised Johnson at the beginning of the encounter that he was being detained, precisely the assertion of authority which *Hodari D.* determined indicated an attempted seizure. *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547. By contrast, there is no indication that a reasonable person, in Smith's position, would not have felt free to end the encounter.

To ensure that Smith's participation in the questioning was not "an individual's submission to a show of governmental authority tak[ing] the form of passive acquiescence," *Brendlin*, 127 S.Ct. at 2405, we consider whether the factors outlined in *Mendenhall* were present here: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. At this stage in the encounter, when the District Court found the first seizure was made, the two officers were still in their car, neither officer displayed his weapon, there was no physical touching, and no indication as to the language or tone of the officer's voice that might have signaled a clear show of authority. Under the totality of the circumstances, Smith was not seized for Fourth Amendment purposes when Officer Muziol repeatedly asked the question, "Where is your girl's house?"

## IV.

 In the alternative, the District Court found there was a show of authority when Officer Muziol "instructed Smith to place his hands on the vehicle ... [and] that Smith initially submitted to this show of authority when he took two steps toward the police vehicle in compliance." Assuming the officer's instruction was a show of authority, the question is whether, from an objective perspective, taking two steps towards the car was in fact a submission.

The District Court relied upon *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006). In *Brown*, we held a police officer's

---

**3.** There is no record evidence specifying the number of times Officer Muziol asked Smith the same question; at oral argument, the lawyers referred to Officer Muziol asking the same question "several times."

statement to Brown and his friend that "a robbery victim was being brought over to identify them as possible suspects and, if they were not identified, they would be free to go—necessarily implying that they were not free to leave [—was] . . . a clear show of authority." *Id.* at 245.[4] In addition, the officer also made a show of authority when he demanded to pat down Brown and his companion. This "would have conveyed to a reasonable person that he was being ordered to restrict his movement." *Id.* (quoting *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547) (internal quotation marks omitted).

 We found Brown "clearly submitted to this show of authority" as he stayed by the officer and turned to face the police car when prompted to do so by the officer's demand. *Id.* at 246. There was some dispute whether Brown had fully placed his hands on the car or was in the process of doing so when he attempted to flee (after which a firearm was discovered on his person).[5] But, we determined this dispute was not relevant because either way, Brown demonstrated more than momentary compliance by "turning to face the police car and placing (or moving to place) his hands on the vehicle." *Id.* We determined that Brown's movement to face the car and movement of his hands to the car hood was a submission to the officer's show of authority and effectuated a seizure.

*Brown* is distinguishable. The officer told Brown he was not free to go until the robbery victim arrived. Brown had already submitted to this show of authority (the officer's demand for him to stay) when the officer asked him to face the car and place his hands on the hood. While the moment that Brown turned to face the car was the first physical contact between the officer and the defendant, Brown already had submitted by following the officer's order to stay put. In other words, his submission by that point was manifest.

In *United States v. Valentine*, decided six years before *Brown*, we found momentary compliance was not enough to trigger a seizure under *Hodari D.* 232 F.3d 350, 359 (3d Cir.2000). In *Valentine*, two uniformed officers in a marked car responding to an anonymous tip approached Valentine and two others in a parking lot. The three men began walking away from the police immediately. *Id.* at 353. An officer ordered Valentine to come over and place his hands on the car. Valentine responded, "Who me?" and then charged towards one of the officers in an attempt to flee. *Id.* Even accepting Valentine's version of events in which he claims to have momentarily complied with the officer's orders because he stopped and "gave his name," we found "he did not submit in any realistic sense to the officer's show of authority." *Id.* at 359.

4. In *Brown*, police received a tip that two men who fit the description of robbery suspects were in a nearby convenience store. The description was especially bare-bones; the police were looking for two black males with dark clothing. 448 F.3d at 242. As the two suspects left the convenience store, they hailed a cab. Before they were able to enter the cab, an officer approached them, dismissed the cab and "informed them that they looked like two persons who had attempted to commit a robbery and that he wanted to talk to them." *Id.* at 243. The officer informed

them that the victim of the robbery was coming to the convenience store to see whether she could identify the two men as her robbers and if she did not, they were free to go. The officer also decided to pat them down for his safety. *Id.*

5. Imminent physical contact by a police officer with a suspect can be indicative of a seizure. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.

In *United States v. Coggins*, we determined a suspect had been seized (i.e., submitted to the officer's show of authority) despite a subsequent flight. 986 F.2d 651 (3d Cir.1993). In *Coggins*, the suspect "made a clear request to leave while under questioning by an officer. Coggins was ordered to remain and complied by sitting back down in the stairwell with his companions ... [e]ven though he fled soon after." *Id.* at 654. In *Brown*, we analogized Brown's compliance to that of Coggins, noting that Brown first yielded to the officer's show of authority by staying put and turning to face the car, in distinction from Valentine who only paused momentarily before attempting to flee. 448 F.3d at 246. In *Coggins*, as well as in *Brown* and *Johnson*, the police officer clearly stated the suspect was not free to leave and the suspect complied. No similar submission occurred here. There is no indication that Smith's two steps were more than "momentary compliance." Recently, in *United States v. Waterman*, we suggested that submission to authority under *Hodari D.*, "requires at minimum, that a suspect manifest compliance with police orders." 569 F.3d 144, 146 n. 3 (3d Cir.2009). Two steps towards the hood of a car does not manifest submission to the police officers' show of authority.

### V.

In sum, the evidence here does not support either of the two seizures found by the District Court. In the first instance, there was no show of authority by the police officers. Smith was not told he was detained. He was never physically touched by either officer, nor was his movement impeded by their presence. In the second instance, his two steps towards the officers' vehicle did not indicate submission to the officers' show of authority. Given the totality of the circumstances, there is nothing to suggest Smith's two steps or his non-responsive answers represented manifest compliance with the officer's orders.

For the foregoing reasons, we will reverse the order of the District Court suppressing the evidence and remand for further proceedings consistent with this opinion.