**UNITED STATES of America,**
**Plaintiff,**

v.

**Ronald CRANDELL, Defendant.**

**Criminal Action No. 06–232 (JAG).**

United States District Court,
D. New Jersey.

Nov. 10, 2009.

---

31. *Id.*

Eric Todd Kanefsky, Esquire, Assistant United States Attorney, Office of the United States Attorney, Newark, NJ, for United States of America.

Lisa Mack, Esquire, Louise Arkel, Esq., Assistant Federal Public Defenders, Office of the Federal Public Defender, Newark, NJ, for Defendant Ronald Crandell.

## OPINION

GREENAWAY, JR., District Judge.

This matter comes before this Court on defendant Ronald Crandell's ("Defendant" or "Crandell") motion to suppress evidence recovered in connection with a stop and frisk conducted on July 15, 2005. The

questions now before this Court, as a result of the Third Circuit's remand, are whether Crandell was seized within the meaning of the Fourth Amendment, and, if he was not seized, whether he consented to a frisk. This Court finds that Crandell was seized. The stop and frisk violated Crandell's Fourth Amendment right to be free from unreasonable searches and seizures. The fruits of the stop and frisk, namely a handgun, were tainted by the unconstitutionality of the stop. Defendant's motion to suppress the evidence seized after the stop is granted.

## I. BACKGROUND

In an Opinion dated September 7, 2007, this Court granted Defendant's motion to suppress evidence recovered in connection with a stop and frisk, which occurred on July 15, 2005.[1] In reaching its conclusion, this Court presumed that Defendant had been seized within the meaning of the Fourth Amendment and then went on to conduct an analysis of the anonymous tip evidence which led to the confrontation between police officers and Defendant. This Court found that the anonymous tip did not provide officers with reasonable suspicion to conduct a *Terry* stop[2] and thus excluded the gun evidence obtained as a result of the stop and frisk. The Government appealed this Court's ruling. The Third Circuit held that this Court "should have considered whether the encounter was consensual at the outset instead of presuming that the police seized

Crandell." *United States v. Crandell,* 554 F.3d 79, 85 (3d Cir.2009). The Court of Appeals vacated this Court's decision and remanded the case to this Court.

The task now before this Court is to determine, based on Supreme Court and Third Circuit precedents, whether Crandell was seized within the meaning of the Fourth Amendment.[3]

## II. FACTS

This Court conducted a suppression hearing on November 28, 2006. Two of the three officers who were involved in the confrontation between police and Crandell on July 15, 2005 testified. Based on the testimony of those two officers, Avbend Drishti ("Drishti") and Angel Valez ("Valez"), the facts adduced are as follows:

On July 15, 2005, Officers Drishti, Valez, and Jimmy Miller were on patrol in the Hoboken Housing Projects. (Tr. of Trial Proceedings, Nov. 28, 2006, Suppression Hr'g [hereinafter "Tr."] 5:8–6:1, 7:7–19.) Officer Drishti described the Housing Projects as approximately twenty buildings located in an area that measures four blocks by two blocks. (Tr. 7:12–24.) While on patrol, Officer Drishti received a call on his cellular phone from dispatch regarding an anonymous tip. (Tr. 6:2–7.) Drishti testified that the call described a "male, black male, with dreadlocks with blonde tips, wearing a tan shirt and blue jeans [ ] with a handgun in the small of his back." (Tr. 6:7–10.) Officer Drishti re-

---

1. *See United States v. Crandell,* 509 F.Supp.2d 435 (D.N.J.2007).

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. The Government opted not to appeal this Court's ruling that the anonymous tip did not provide the officers with a basis for reasonable suspicion to stop and frisk Crandell. As the Third Circuit noted in its opinion, the

Government "concedes that the officers' basis for suspicion did not rise to the constitutionally required standard of reasonable suspicion to validate a *Terry* stop. Without reasonable suspicion, the seizure of Crandell would be illegal and the gun obtained in connection with the ensuing pat-down would properly be suppressed under the metaphorical 'fruit of the poisonous tree' doctrine." *Crandell,* 554 F.3d at 87.

ceived the call, while he and Officers Valez and Miller were standing at the corner of Fourth Street and Jackson Street. (Tr. 8:7–9.) Drishti testified that upon hearing the tip, he immediately thought of Defendant, Ronald "Ricky" Crandell. (Tr. 7:5–11.)

Drishti relayed the tipster's information to Officers Valez and Miller and the three officers immediately proceeded to the intersection of Fifth and Jackson. (Tr. 8:15–9:5, 43:7–12.) They chose to proceed to this area because, according to Officer Drishti, "we [knew] Mr. Crandell frequents that area a lot." (Tr. 8:19–20.) Officer Drishti added, and Officer Valez agreed, however, that they also chose the area because it is known as a "high-crime area." (Tr. 8:19–23, 41:8–25.)

The officers searched unsuccessfully for Defendant at this location. (Tr. 9:7–8.) The officers crossed over Fifth Street, back toward Fourth Street. (Tr. 9:9–19, 20:21–24, 42:8–11.) As they reached the corner of Fifth and Jackson, after crossing Fifth Street, they saw Defendant walking toward them. (Tr. 9:19–21.)

Officer Drishti testified that Defendant, upon seeing the officers, did not react. Defendant simply kept walking toward them, until Officer Valez stopped him about halfway between Fourth Street and Fifth Street. (Tr. 21:1–3, 44:3–5.) Officers Drishti and Miller also approached Defendant, on either side of Officer Valez, forming a semi-circle. (Tr. 10:14–15, 26:4–14.) All three officers were uniformed, and stood about two feet from Defendant. (Tr. 51:25–52:2, 26:17–24, 52:24–53:7.)

Officers Drishti and Valez testified that Valez spoke to Defendant. The testimony of Officers Drishti and Valez differs slightly regarding what was said to Defendant and the order in which it was said.[4] Valez testified: "[A]s [Defendant] walked towards us, I stopped him ... and I told him I received information that [he] might have a weapon on [him] and I wanted to give [him] a pat down for our protection[.] I told [Defendant] he was free to leave at any time." (Tr. 44:3–8.) Officer Valez testified that Defendant "put his arms up." (Tr. 44:12.)

Officer Valez testified that after Crandell put his arms up, he began the pat down. (Tr. 44:12–13.) Valez testified that "as I was patting [Defendant] down, he hit my arm, he turned around and he ran [and] the weapon fell from the back of his pants." (Tr. 44:13–14.) Officer Miller secured the weapon. (Tr. 12:9–12.) Officers Drishti and Valez gave chase, following Defendant into the building at 320 Jackson Street. (Tr. 12:12–20.) Officer Drishti testified that they proceeded immediately to the roof and searched every apartment on the top two floors before returning to the street. (Tr. 31:9–32:24.)

The officers then returned to headquarters and placed the handgun in evidence and issued six warrants for the arrest of Defendant. (Tr. 13:10–12.) Officer

---

**4.** To the extent that the testimony of the two officers differs materially, this Court will rely on the testimony of Officer Valez, since Valez conducted the stop and frisk at issue in this case and had the most direct contact with Defendant. During oral argument, the Government's position was that it "did not have a problem" with resolving the variance in testimony in favor of Officer Valez's interpretation. (Tr. of Trial Proceedings, July 9, 2009, 46:2.) In Officer Valez's account, he notifies Defendant of the call regarding the weapon before beginning the pat down. (Tr. 44:3–12.) In Officer Drishti's account, Officer Valez requests the pat down for safety and mentions the tip only after the pat down begins and Defendant asks "what's this all about?" (Tr. 11:9–16.) In both accounts, it is clear that the three officers stopped Defendant and then immediately requested consent to search him.

Drishti wrote the police report summarizing the events. (Tr. 13:16–17.) Defendant was subsequently apprehended by a bounty hunter and turned in to police headquarters. (Tr. 14:14–17.)

### III. *LEGAL STANDARDS*

The Supreme Court of the United States and the Court of Appeals for the Third Circuit have each spoken on myriad Fourth Amendment issues; indeed, each has commented on the issue at hand, i.e., when, and under what circumstances, a seizure of a suspect occurs. In its opinion remanding this matter, the Third Circuit specifically mentioned two Supreme Court precedents—*Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) and *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002)—that this Court should incorporate into its analysis.

### A. *Florida v. Bostick*

The Supreme Court has spoken definitively on what constitutes a seizure—"[w]e adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter." *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382.

In *Bostick,* two uniformed officers boarded a bus bound for Atlanta from Miami during a stopover in Fort Lauderdale. *Id.* at 431, 111 S.Ct. 2382. "Eyeing the passengers, the officers, admittedly without articulable suspicion, picked out the defendant and asked to inspect his ticket and identification. The defendant's ticket matched his identification and both were immediately returned to him as unremarkable. However, the two police officers persisted and explained their presence as narcotics agents on the lookout for illegal drugs. In pursuit of that aim, they then requested the defendant's consent to search his luggage." *Id.* at 431–32, 111 S.Ct. 2382.

The subsequent search proved to be fruitful. The defendant, Bostick, was arrested and charged with trafficking cocaine. *Id.* at 432, 111 S.Ct. 2382. He moved to "suppress the cocaine on the grounds that it had been seized in violation of his Fourth Amendment rights." *Id.* The Florida Supreme Court reversed the decision of the state appellate court, which had held that Bostick had not been seized within the meaning of the Fourth Amendment. In reversing, the Florida Supreme Court "reasoned that Bostick had been seized because a reasonable passenger in his situation would not have felt free to leave the bus to avoid questioning by the police." *Id.* at 433, 111 S.Ct. 2382. The Florida Supreme Court adopted a per se rule holding that random sweeps of buses to search for drugs were unconstitutional. *Id.*

The Supreme Court of the United States found that the Florida Supreme Court erred in focusing on whether Bostick was 'free to leave' rather than on the principle underlying those words. *Id.* at 435, 111 S.Ct. 2382. The Court explained, "when police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking. But when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he could leave is not an accurate measure of the coercive effect of the encounter." *Id.* at 435–36, 111 S.Ct. 2382. The Court went on to say that "Bostick was a passenger on

a bus that was scheduled to depart. He would not have felt free to leave the bus even if the police had not been present. Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus, it says nothing about whether or not the police conduct at issue was coercive." *Id.*

The Court reasoned that Bostick's freedom of movement was restricted by a factor independent of police conduct: his being a passenger on a bus. *Id.* Accordingly, the Court held the 'free to leave' analysis was inapposite. The Court said that the "appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.... [T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 436–37, 111 S.Ct. 2382.

## B. *United States v. Drayton*

In *Drayton,* the Supreme Court held that police officers did not seize passengers on a bus by failing to warn them of their right to refuse to cooperate. *Drayton,* 536 U.S. at 203–04, 122 S.Ct. 2105. The Court stated, "[u]nder these cases, it appears that the [Eleventh Circuit] Court of Appeals would suppress any evidence obtained during suspicion-less drug interdiction efforts aboard buses in the absence of a warning that passengers may refuse to cooperate. The Court of Appeals erred in adopting this approach." *Id.* at 203, 122 S.Ct. 2105. The Supreme Court noted that it "has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." *Id.* at 206, 122 S.Ct. 2105.

The Supreme Court concluded that the respondents/defendants, Drayton and Brown, had not been seized within the meaning of the Fourth Amendment when officers boarded a bus and began to question passengers.

The factual background of *Drayton* is as follows:

On February 4, 1999, respondents Christopher Drayton and Clifton Brown, Jr., were traveling on a Greyhound bus en route from Ft. Lauderdale, Florida, to Detroit, Michigan. The bus made a scheduled stop in Tallahassee, Florida. The passengers were required to disembark so the bus could be refueled and cleaned. As the passengers reboarded, the driver checked their tickets and then left to complete paperwork inside the terminal. As he left, the driver allowed three members of the Tallahassee Police Department to board the bus as part of a routine drug and weapons interdiction effort. The officers were dressed in plain clothes and carried concealed weapons and visible badges.

Once onboard Officer Hoover knelt on the driver's seat and faced the rear of the bus. He could observe the passengers and ensure the safety of the two other officers without blocking the aisle or otherwise obstructing the bus exit. Officers Lang and Blackburn went to the rear of the bus. Blackburn remained stationed there, facing forward. Lang worked his way toward the front of the bus, speaking with individual passengers as he went. He asked the passengers about their travel plans and sought to match passengers with luggage in the overhead racks. To avoid blocking the aisle, Lang stood next to or just behind each passenger with whom he spoke.

According to Lang's testimony, passengers who declined to cooperate with him or who chose to exit the bus at any time would have been allowed to do so without argument. In Lang's experience, however, most people are willing to cooperate. Some passengers go so far as to commend the police for their efforts to ensure the safety of their travel. Lang could recall five to six instances in the previous year in which passengers had declined to have their luggage searched. It also was common for passengers to leave the bus for a cigarette or a snack while the officers were on board. Lang sometimes informed passengers of their right to refuse to cooperate. On the day in question, however, he did not.

Respondents were seated next to each other on the bus. Drayton was in the aisle seat, Brown in the seat next to the window. Lang approached respondents from the rear and leaned over Drayton's shoulder. He held up his badge long enough for respondents to identify him as a police officer. With his face 12–to–18 inches away from Drayton's, Lang spoke in a voice just loud enough for respondents to hear: 'I'm Investigator Lang with the Tallahassee Police Department. We're conducting bus interdiction [sic], attempting to deter drugs and illegal weapons being transported on the bus. Do you have any bags on the bus?' Both respondents pointed to a single green bag in the overhead luggage rack. Lang asked, 'Do you mind if I check it?,' and Brown responded, 'Go ahead.' Lang handed the bag to Officer Blackburn to check. The bag contained no contraband. Officer Lang noticed that both respondents were wearing heavy jackets and baggy pants despite the warm weather. In Lang's experience drug traffickers often use baggy clothing to conceal weapons or narcotics.

The officer thus asked Brown if he had any weapons or drugs in his possession. And he asked Brown: 'Do you mind if I check your person?' Brown answered, 'Sure,' and cooperated by leaning up in his seat, pulling a cell phone out of his pocket, and opening up his jacket. Lang reached across Drayton and patted down Brown's jacket and pockets, including his waist area, sides, and upper thighs. In both thigh areas, Lang detected hard objects similar to drug packages detected on other occasions. Lang arrested and handcuffed Brown. Officer Hoover escorted Brown from the bus.

Lang then asked Drayton, 'Mind if I check you?' Drayton responded by lifting his hands about eight inches from his legs. Lang conducted a pat down of Drayton's thighs and detected hard objects similar to those found on Brown. He arrested Drayton and escorted him from the bus. A further search revealed that respondents had duct-taped plastic bundles of powder cocaine between several pairs of their boxer shorts. Brown possessed three bundles containing 483 grams of cocaine. Drayton possessed two bundles containing 295 grams of cocaine.

Respondents were charged with conspiring to distribute cocaine ... and with possessing cocaine with intent to distribute it. They moved to suppress the cocaine, arguing that the consent to the pat down search was invalid.

*Id.* at 197–99, 122 S.Ct. 2105 (internal citations omitted).

The Supreme Court held that the police did not seize Drayton and his traveling companion when they boarded the bus and began questioning passengers. *Id.* at 200, 122 S.Ct. 2105. The Court stated that "the officers gave the passengers no reason to believe that they were required to

answer the officers' questions." *Id.* at 203, 122 S.Ct. 2105. The Court noted that everything that took place between the officers and the defendants suggested that the encounter was cooperative and that nothing occurred that was coercive or confrontational. *Id.* at 204, 122 S.Ct. 2105. Justice Kennedy noted further that, "[n]othing he [Officer Lang] said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter." *Id.* The Court continued, "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. It is beyond question that had this encounter occurred on the street, it would be constitutional." *Id.*

The Court repeated that the totality of the circumstances standard must govern an inquiry into whether a person is seized within the meaning of the Fourth Amendment. *Id.* at 207, 122 S.Ct. 2105.

*Bostick* and *Drayton* have established fairly broad parameters within which a court may determine whether a seizure has occurred. The Government now argues that subsequent Third Circuit precedents have further narrowed the circumstances which would constitute a seizure.

### C. *United States v. Wilson*

■ " '[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained.' Put another way, no seizure has occurred if 'a reasonable person would feel free to disregard the police and go about his business, or ultimately whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter....' " *United States v. Wilson,* 413 F.3d 382, 386 (3d Cir.2005)

(citing *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (internal citations omitted)).

In *Wilson,* the Third Circuit affirmed the district court's determination that the defendant, Esco Wilson, had not been seized within the meaning of the Fourth Amendment. Defendant Wilson was stopped for a traffic violation on the morning of September 16, 2001 by a Pennsylvania State Police Trooper. *Id.* at 384. Wilson conceded that the initial traffic stop was valid. *Id.* Wilson presented the trooper with a valid driver's license and a rental car agreement. *Id.* The trooper noticed that the rental car agreement appeared to have expired a month earlier. *Id.* After running a check on the rental car, the trooper discovered that the car had *not* been reported stolen. *Id.* The trooper then returned to Wilson's car and asked him to exit and stand at the rear of the car. *Id.* Wilson was given a citation and his documents were returned. *Id.* The trooper informed Wilson that he was free to leave. *Id.* Wilson then took a few steps toward his car. *Id.* The trooper asked Wilson if he could question him about the rental car agreement and proceeded to ask Wilson questions about the rental car and Wilson's work and travel plans. *Id.* Wilson informed the trooper that he was selling CD's and volunteered to show the trooper the contents of the trunk of his car. *Id.*

Wilson opened the trunk, which contained two bags—one of the bags belonged to Wilson, and the other belonged to his passengers. *Id.* Inside Wilson's bag, the trooper discovered a brick of cocaine. *Id.* at 385. When the trooper looked at Wilson, he (Wilson) had already turned around and placed his hands behind his back. *Id.* The trooper then arrested Wilson and his passengers and transported them to the police barracks. *Id.* The Gov-

ernment subsequently obtained an indictment against Wilson based on the same incident. *Id.* Wilson moved to suppress the cocaine and his post-arrest statements. *Id.*

The Third Circuit applied the totality of the circumstances analysis. *Id.* at 387. Specifically, the Court of Appeals pointed out that as in *Drayton,* there was no indication that the officer who stopped Wilson "made any intimidating movement or show of force or that he asked Wilson questions using an authoritative tone or voice." *Id.* Further, although the defendant was isolated on the side of highway, the record showed "no circumstances so intimidating that, in combination they would have caused a reasonable person to perceive that he was not free to leave." *Id.*

The Third Circuit also affirmed the district court's determination that Wilson's consent to the search of his bag was voluntary. *Id.* at 388. In doing so, the Court of Appeals used a totality of the circumstances test:

> "[A] search conducted pursuant to consent is one of the specifically established exceptions to the warrant requirement." The voluntariness of an individual's consent is a question of fact to be determined from all the circumstances. "[T]he critical factors comprising a totality of the circumstances inquiry include the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]."

*Id.* (internal citations omitted).

The Third Circuit stated specifically that Wilson "then cooperated with [the trooper]

throughout the encounter, as he answered all of [the trooper's] questions, offered to show [the trooper] his CDs, and initiated opening the trunk of his car in order to do so. As the District Court found, there is no indication in the record that 'Wilson was unable by virtue of age or intelligence to understand the situation.' In this context, the District Court hardly erred in finding that Wilson's consent to the search was voluntary. [The trooper's] search of Wilson's bag therefore did not violate the Fourth Amendment." *Id.* (internal citations omitted).

## D. *United States v. Williams*

In *Williams,* the Third Circuit provided guidance as to when a police encounter with an individual constitutes a seizure within the meaning of the Fourth Amendment. *United States v. Williams,* 413 F.3d 347 (3d Cir.2005). The Court of Appeals applied the Supreme Court's precedent in *California v. Hodari D.* to determine that a seizure, at minimum, requires physical force by police or a submission by the individual to an assertion of police authority.[5] "In the seminal *Terry* case, the Supreme Court explained that a seizure occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' More recently, the Supreme Court has held that for there to be a seizure, either the police must apply physical force to the person being seized, or the person must submit to an assertion of police authority." *Williams,* 413 F.3d at 352 (citing *California v. Hodari D.,* 499 U.S. 621, 626–28, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

---

**5.** The Government cites to *United States v. Rogers,* 334 Fed.Appx. 485 (3d Cir.2009), an admittedly non-precedential ruling, as one of the Third Circuit's most recent iterations regarding seizure. The Court of Appeals in that

decision acknowledged the *Drayton* holding by stating "[w]hen a reasonable person would feel free to terminate the encounter, no seizure has occurred." *Id.* at *1. In all other respects, *Rogers* is unremarkable. *See id.*

■ "[A] seizure occurs whenever an officer restrains the freedom of a person to walk away. Thus, although even a brief investigatory stop is considered a 'seizure,' not every encounter between the police and a citizen constitutes a seizure within the meaning of the Fourth Amendment." *Id.*

In *Williams*, the Court of Appeals reversed the district court for the District of the Virgin Islands, which had determined that during the defendant's first arrest he had been seized within the meaning of the Fourth Amendment, without reasonable suspicion. *Id.* at 351–52. The facts are that four police officers came upon a parked blue van, that had its rear doors open, enabling the officers to see straight into the vehicle. *Id.* at 349. As the officers approached the van, they observed defendant Williams seated in the rear of the van, engaged in some sort of activity. *Id.* The officers stopped their car, exited their car, and approached the van. *Id.* An officer later testified that he had no suspicion that criminal activity was taking place when he began his approach toward the van. *Id.* From a distance of about twelve or thirteen feet, an officer saw Williams holding a large ziplock bag containing a green leafy substance that appeared to be marijuana. *Id.* When Williams noticed the officers approaching, he attempted to discard the bag. *Id.* Williams was removed from the van, searched, and handcuffed. *Id.* A search of the van revealed an additional fourteen smaller bags, all of which contained a similar looking substance. *Id.* The green leafy substance in all the bags field-tested positive for marijuana. *Id.* After receiving *Miranda* warnings at the station house, Williams acknowledged responsibility for four of the bags in the van but denied ownership of the remaining bags. *Id.*

The Court of Appeals concluded that Williams was not seized within the meaning of the Fourth Amendment when the officers approached the van to question him. *Id.* at 352. "We conclude that there was no seizure because there was no use of physical force, nor was there any show of authority when the police approached the van in their marked cruiser, exited their vehicle, and approached the parked van on foot. As the Supreme Court has noted, '[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places.' " *Id.* (internal citation omitted).

### E. *United States v. Brown*

In *Brown*, the Third Circuit Court of Appeals reversed the district court and held that the defendant had been seized within the meaning of the Fourth Amendment. *United States v. Brown*, 448 F.3d 239 (3d Cir.2006). In *Brown*, the Court of Appeals found that police had demonstrated a show of authority when they informed the defendants that they had been suspected of committing a robbery, and that if they were not identified by the victim, they would be free to go, which necessarily implied that they were not free to leave. *Id.* at 245.

■ "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.' Put another way, when a seizure is effected by even 'the slightest application of physical force,' it is immaterial whether the suspect yields to that force. In contrast, if a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim. '[T]he

test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" *Id.* (internal citations omitted).

In *Brown*, two women were walking along a street in Philadelphia when they were approached by two black teenagers who attempted to rob one of the women. *Id.* at 241. Soon thereafter, a police officer arrived at the victim's location and took a description of the suspects which he relayed over the radio. *Id.* In relaying this description, the Government in this case contended that the officer radioed the information as: "black male suspects in their teens or 20's with dark clothing." *Id.*

An officer approached defendants Brown and Smith, and told them that they fit the description of persons who attempted to commit a robbery and that he needed to investigate them. *Id.* at 243. The officer let Brown and Smith know that the victim was coming to their location to identify them and that he wanted to pat them down for his safety. *Id.* The officer said that he told Brown and Smith that they were free to go if they were not identified as the attempted robbers. *Id.* When the officer attempted to frisk Brown, Brown struggled and attempted to escape. *Id.* When this occurred, the officer put Brown in handcuffs. *Id.* The officer then found a

gun in Brown's belt. *Id.* A different officer stated that Brown's hands were on the hood of the car for the pat down prior to his attempt to breakaway. *Id.* at 244. The officer who initially approached the defendants states that Brown and Smith intended to put their hands on the hood of the car but never did. *Id.*

Once the victim was on the scene, she informed the officers that Brown and Smith were not the males who attempted to rob her and that Brown and Smith were older than the suspects. *Id.* Brown then moved to suppress the firearm, claiming that there was a lack of reasonable suspicion for the stop. *Id.* The district court denied Brown's motion to suppress and the Court of Appeals reversed, concluding that "Brown was seized before his aborted escape attempt." *Id.* at 252.

### F.  United States v. Waterman

In *Waterman*, the Third Circuit reversed the district court, holding that the defendant was not seized within the meaning of the Fourth Amendment because he was neither subjected to physical force by the police, nor did he submit to a show of the authority by police. *United States v. Waterman*, 569 F.3d 144 (3d Cir.2009).

Specifically, the Court of Appeals stated, "[i]n *Hodari D.*, the Supreme Court held that an arrest 'requires either physical force ... or, where that is absent, submission to the assertion of authority.'[6] The

**6.** In *Hodari D.*, two plain clothes police officers were patrolling a high crime area in Oakland, California. *Hodari D.*, 499 U.S. at 622, 111 S.Ct. 1547. The officers were dressed in plain clothes and wore jackets with the word "Police" embossed on both the front and the back. *Id.* These officers patrolled the area in an unmarked police car and noticed four or five youths huddled around a parked car. *Id.* When the youths saw the car, they ran and one of the officers gave chase on foot. *Id.* at 623, 111 S.Ct. 1547. Hodari ran as he was chased by the officers, and was unaware

that the officer was so close to him until the officer was upon him. *Id.* Hodari then threw away what was later discovered to be crack cocaine and was subsequently tackled by the officer. *Id.*

The only question presented to the Supreme Court was whether Hodari was seized within the meaning of the Fourth Amendment at the time he dropped the crack cocaine. *Id.* In answering this question, the Court held that with respect to a "show of authority," a seizure does not occur where a suspect does not

Court explained that the concept of physical force necessary for a 'seizure' does not consist merely of the show of authority, but, rather, requires the application of force or 'laying on of hands.' With respect to 'submission,' the Court noted that compliance with police orders to stop should be encouraged. This would seem to require something more than a momentary pause or mere inaction. The Court did not differentiate between an 'arrest' and a *Terry* stop, and we have universally looked to the requirements set forth in *Hodari D.* to determine whether a police encounter with a citizen constitutes a 'seizure' within the meaning of the Fourth Amendment." *Id.* at 145–46 (internal citations omitted).

In *Waterman,* two officers responded to a dispatcher's report that an anonymous informant had observed someone with a gun. *Id.* at 144. The dispatcher did not indicate the tip's reliability. *Id.* The officers responded to the call, and observed the silhouettes of five people standing on the front porch of a house. *Id.* at 144–45. The officers saw that two females and three males were on the porch. *Id.* at 145. Defendant Waterman was standing in the middle of the group, near the front door to the residence. *Id.* Getting out of the police cruiser, one of the officers positioned herself eight to ten feet from the residence, while the other approached the house. *Id.* The officers did not observe any weapons but ordered the individuals on the porch to place their hands in the air for safety reasons. *Id.* All complied except Waterman, who kept his hands in his jacket pockets. *Id.* An officer with an unobstructed view of Waterman suspected that he had a gun because he moved his hands toward his waistband. *Id.* The officers drew their firearms and repeatedly

commanded the defendant to put his hands in the air. *Id.* The defendant did not comply but moved one of his hands behind his back and turned the doorknob of the front door, which did not open. *Id.* One of the officers continued, unsuccessfully, to order Waterman to show his hands. *Id.* Both officers maintained their weapons in a drawn position, aimed at the individuals standing on the porch. *Id.* Just then, an individual from inside the residence opened the door and stepped onto the porch. *Id.* As the individual exited, Waterman entered the residence. *Id.* One of the officers, positioned near the porch, thrust his leg into the doorway to prevent the door from being shut. *Id.*

The district court concluded that Waterman was effectively "stopped" when one of the officers commanded everyone on the porch to put their hands in the air. *Id.* Based on a finding of an unlawful seizure on the porch, the district court suppressed a gun and drugs subsequently discovered in the residence. *Id.*

The Court of Appeals reversed the district court, explaining that the Supreme Court's decision in *Hodari D.* requires that for a seizure to occur, there must be *"either* physical force ... *or,* where that is absent, *submission* to the assertion of authority." *Id.* (quoting *Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547) (emphasis in original). The Third Circuit found that there was no use of physical force on the part of the police officers and no submission to a show of authority because the defendant failed to raise his hands in response to the officers' directive. *Id.* at 146. The Third Circuit concluded that the defendant had

---

yield. *Id.* at 626, 111 S.Ct. 1547. The Court assumed that even if the officer's chase was a "show of authority," Hodari did not comply and was not seized until he was tackled by the

officer. *Id.* at 629, 111 S.Ct. 1547. The cocaine was abandoned before he was seized and was therefore not the fruit of a seizure and could not be excluded as such. *Id.*

not been seized within the meaning of the Fourth Amendment. *Id.*[7]

## IV. ANALYSIS

■ The Third Circuit's opinion remanding this matter instructed that "[t]he District Court's role is to find facts and determine in the first instance whether Crandell was seized within the meaning of the Fourth Amendment under the totality of circumstances." *Crandell,* 554 F.3d at 86. This Court, after reviewing the pertinent Supreme Court and Third Circuit precedents, finds that based on the totality of the circumstances, Crandell was seized within the meaning of the Fourth Amendment. Given the location and positioning of the officers, their declaration that they received a tip about Defendant's possession of a weapon, and their request to pat him down to ensure their safety, a reasonable person, in Crandell's circumstance, would not have felt that he or she could terminate the encounter.

This Court begins its analysis with *Drayton,* in recognition of the Third Circuit's statement that the Supreme Court's decision in *Drayton* provides a "framework" for this Court to "bear in mind when evaluating the issue." *Crandell,* 554 F.3d at 86. In *Drayton,* the Supreme Court inquired "whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Drayton,* 536 U.S. at 202, 122 S.Ct. 2105 (citing *Bostick,* 501 U.S. at 436, 111 S.Ct. 2382). The Court found that the defendants had not been seized because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no com-mand, not even an authoritative tone of voice." *Id.* at 204. Indeed, the *Drayton* Court also stated, "[i]t is beyond question that had this encounter occurred on the street, it would be constitutional." *Drayton,* 536 U.S. at 204, 122 S.Ct. 2105.

The facts in *Drayton* differ significantly from the facts in this case. One critical difference lies in the fact that in *Drayton,* the police officers were dressed in plain clothes and intended to conduct a random drug interdiction search. The officers informed the defendants in *Drayton* of their objective. In contrast, here, the officers received an anonymous tip about a black male, with dreadlocks and blonde tips, carrying a gun, which led them to search, specifically, for Defendant Crandell. Defendant was approached by three uniformed officers. Officer Valez told Crandell that he had "received information that [Crandell] might have a weapon on [him]" and that "[he] wanted to give [Defendant] a pat down for [the officers'] protection." (Tr. 44:3–8.) He then stated that Crandell "was free to leave at any time." (*Id.*)

There is a notable difference between an encounter where a defendant is among a group of people to whom the police are addressing questions, in furtherance of a random drug interdiction effort; and here, where Crandell was sought out by name by a group of officers, who told him they suspected him of possessing a weapon and wished to pat him down.

Also, in *Drayton,* the three officers were positioned far apart from one another on the bus and none of them blocked the aisle. Here, the three officers stood two feet in front of Crandell, in a semi-circle around him, with a fence to his immediate left.

---

**7.** *See also Brown,* 448 F.3d at 245 (" '[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.' ") (citation omitted).

The officers' positioning, in such close proximity to Crandell, makes this situation more akin to the "blocking of an exit" than the situation in *Drayton*. Here, the officers essentially blocked Crandell's ability to continue walking in any direction. The officer's statement that Crandell was free to go is belied by the show of authority and the inability to move past the officers without physically touching them.

The Third Circuit has also suggested that this Court consider the Supreme Court's earlier decision in *Bostick*. The *Bostick* Court iterated that "the crucial test [for determining a seizure] is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 436–37, 111 S.Ct. 2382 (citation omitted). The Court held that the defendant in *Bostick* had not been seized when he was approached on a bus by two officers. The Court reasoned that a 'free to leave' analysis was inappropriate because "when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he could leave is not an accurate measure of the coercive effect of the encounter." *Id.* at 435–36, 111 S.Ct. 2382.

Crandell's stop and frisk occurred while he was walking down the street, not while he was a passenger on a bus. His freedom of movement was not naturally confined prior to his interaction with the officers. As such, the analysis and outcome in *Bostick* is inapposite here.

Having considered the Supreme Court precedents, *Drayton* and *Bostick*, this Court must now consider the Third Circuit's own precedents. The facts of this case are most analogous to the facts of *Brown*. In *Brown*, a police officer ap-proached the defendants and told them that he wanted to talk to them because they fit the description of persons who had committed an attempted robbery. *Brown*, 448 F.3d at 243. The Third Circuit stated the defendant had been seized because "there was a clear show of authority when [the officer] told [the defendants] that a robbery victim was being brought over to identify them as possible suspects and, if they were not identified, they would be free to go—necessarily implying that they were not free to leave." *Id.* at 245. Similarly, Crandell was effectively told that he was a suspect in a crime, and then asked to submit to a pat down.

Recently, the Third Circuit reiterated the circumstances that would indicate a show of authority, that, when followed by a submission to that show of authority, would constitute a seizure. In *Smith*, the Court of Appeals explained that those circumstances include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of the language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Smith*, 575 F.3d 308, 313 (3d Cir.2009) (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870).

In *Smith*, two uniformed officers in a marked vehicle pulled up next to the defendant and asked for his identification, to which the defendant responded that he had none. When the officers asked where he was going, the defendant said only that he was going to "[his] girl's house," not varying his answer despite the fact that the officers then asked repeatedly, "where is your girl's house?" *Id.* at 311. The Court of Appeals considered the *Mendenhall* factors and found that no seizure occurred, noting that the two officers remained in their car, neither displayed his

weapon, and there was no indication that the language or tone might have signaled a clear show of authority. *Id.* at 314.

Crandell's encounter with the police is materially different than the encounter at issue in *Smith.* Several officers surrounded Crandell on the street, rather than remain, as they did in *Smith,* in their car. Although the officers here also did not brandish their weapons, and only touched Crandell after he put his arms up for a pat down, the significant difference between the cases involves the language signaling a show of authority. The officers informed Crandell that they possessed information indicating that he had a weapon, and that they wanted to verify whether Crandell possessed that specific weapon in order to ensure their own safety. The officers' use of such language would have indicated to a reasonable person that compliance with the officers' request was compelled.

This Court views the language used by the officers in context. Because the crime suspected here, possession of a handgun, directly relates to the issue of safety, the officers' request for a pat down to assure their own immediate safety is authoritative, in nature.[8] Although Officer Valez also told Defendant that he was "free to leave at any time," this occurred after Officer Valez told Defendant that he wanted to pat him down to assure the officers' safety. A reasonable person, under the totality of the circumstances, would have understood Officer Valez's words to mean that he or she was required to comply and that he or she was not free to leave until it had been established that he or she did not have a weapon in his or her possession.

The Government urges this Court to consider the Third Circuit's decision in *Williams.* The Court of Appeals in that case found no show of authority existed where four officers approached the defendant in his parked van. The van's rear doors were open, enabling the officers to see into the vehicle. Williams was sitting in a parked car when the officers began approaching him, and the officers were thirteen feet away at the time of the alleged seizure.[9] In contrast, the officers stopped Crandell on the street by standing in a semi-circle, two feet away. Additionally, the use of language which would compel compliance, one of the *Mendenhall* factors, is entirely lacking in *Williams,* but is present here.

This Court does not rely on any one particular fact of the encounter in reaching its decision, but looks rather to the totality of the circumstances, as is required by the Supreme Court and the Third Circuit. When the officers informed Crandell that they had received a tip that he possessed a weapon, and then followed that statement by asking that they be allowed to pat him down for their safety, the officers demonstrated a show of authority, to which, as Officer Valez testified, Defendant submit-

---

8. The Government argues that the officers' expression of concern for their own safety did not render the encounter a seizure. The Supreme Court has found that an officer has reason to "fear for his safety" while investigating a person reported to have a concealed weapon in a high crime area. *Adams v. Williams,* 407 U.S. 143, 147–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). This Court is bound by Supreme Court precedents, and agrees that in the instant case the officers' expressed concern for their safety may not alone render the encounter a seizure.

9. Indeed, the Third Circuit noted that the defendant had not noticed the officers as they approached. The officers ultimately approached the defendant and asked him questions. This, however, was not an issue of whether a seizure occurred because, from about thirteen feet away, the officers saw defendant holding a marijuana-like substance, which constituted reasonable suspicion and justified the questioning. *Williams,* 413 F.3d at 353.

ted. *See Waterman*, 569 F.3d at 146 (finding that there was no submission by the defendant, where, pursuant to an officer's directive, others raised their hands in compliance and the defendant did not). There is no dispute that Crandell raised his hands as a result of the show of authority by the officers. The submission, created by the compliance to the officer's show of authority, established the point in time that a seizure occurred.

This Court, relying on the totality of the circumstances standard, finds that a reasonable person would *not* have felt free "to decline the officers' requests or otherwise terminate the encounter." *Drayton*, 536 U.S. at 202, 122 S.Ct. 2105 (cited in *Wilson*, 413 F.3d at 386). Defendant's submission to the show of authority completes the totality of the circumstances analysis. A seizure occurred.[10]

## V. CONCLUSION

For the reasons stated above, this Court finds that Crandell was seized. Defendant's motion to suppress evidence seized from Defendant's person is granted.

---

**10.** The Third Circuit noted in its opinion remanding this case to this Court, that the Government did not appeal this Court's ruling regarding the anonymous tip. *Crandell*, 554 F.3d at 87. Therefore, the only issue for this Court to resolve here is whether Crandell was seized within the meaning of the Fourth Amendment, and, if he was not, whether he consented to a frisk. *Id.* Based on this Court's ruling that Crandell was seized, the issue of consent need not be reached and the inquiry is now at an end.