**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0203-18T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEROME D. JENNINGS,
a/k/a DARVIS J. JENNINGS,
NAQUAN WILKERSON,
and MAQUAN WILKERSON,

    Defendant-Appellant.

_____

> Submitted May 18, 2020 – Decided July 30, 2020
>
> Before Judges Rothstadt and Moynihan.
>
> On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 16-07-0654.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Courtney A. Johnson, Designated Counsel, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Alicia Christine Gres, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jerome Jennings appeals from a judgment of conviction that imposed a ten-year sentence with a five-year period of parole ineligibility, which was entered after a jury convicted him of committing second-degree certain persons not to possess a weapon, N.J.S.A. 2C:39-7(b)(1). On appeal, defendant argues that his motion to suppress the weapon, a handgun, was wrongfully denied because he was unlawfully seized prior to dropping the handgun as observed by the arresting officer, and he never abandoned the handgun, as found by the motion judge. Additionally, he argues that his conviction was the result of unfair jury bias and his extended-term sentence was wrongfully imposed because the trial judge failed to consider two mitigating factors. We find no merit to these contentions and affirm.

I.

The facts relating to defendant's arrest were developed at defendant's suppression hearing and are summarized as follows. According to Detective Jonathan Cincilla, the only witness at the suppression hearing, he and Detective Miguel Acosta were patrolling the area near Walnut Avenue and

Monmouth Street in Trenton on the evening of June 18, 2016. Detective Cincilla testified that this area was known for "open air drug[] sales and for shootings." As the two detectives were driving, they saw defendant standing on the curb, looking at his cell phone. As they drove by him, defendant "looked up and saw [them]," and turned to walk in the opposite direction the officers were driving. According to the detective, defendant appeared to act "unnatural" and his behavior seemed "like it was an immediate reaction to [the detectives'] presence."

While defendant was walking away, he met up with another man, later identified as Joey Thomas. Cincilla knew Thomas from prior narcotics-related arrests with which he was involved.

Upon reaching the intersection of Walnut and Monmouth, the detectives executed a U-turn. As they completed that maneuver, Cincilla noticed defendant reach toward his right side, pull out a handgun, and then toss it onto the ground. After noticing defendant drop the gun, the detectives decided to stop the two men. As Acosta and two other officers who had arrived on the scene detained the two, Cincilla walked back and recovered the handgun. Defendant was taken into custody, while Thomas was sent on his way.

A-0203-18T2

On July 28, 2016, a Mercer County Grand Jury returned an indictment that charged defendant with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), which the State later dismissed, and the second-degree certain persons charge. Thereafter, defendant filed his motion to suppress, which the motion judge denied on April 11, 2017, after considering the evidence adduced at an April 6, 2017 suppression hearing. The judge's order was accompanied by a written statement of reasons.

In his comprehensive ten-page statement of reasons, the judge found that defendant's abandoning the handgun was not the result of an illegal seizure. Rather,

> [t]he police, while patrolling, made a [U]-turn to investigate two men they found suspicious. While that [U]-turn did take steps towards a seizure, it [was] insufficient, by itself, to give a reasonable person the impression they [were] not free to leave. As such, [d]efendant was not forced to abandon the gun due to an illegal seizure. After seeing the abandonment, the officers had reasonable suspicion that crime was afoot, and legally stopped [d]efendant and recovered the abandoned gun.

Defendant's jury trial began on June 13, 2018 before another judge and continued for eight days before the jury convicted defendant of the second-degree certain persons offense as charged in the indictment. Prior to sentencing, the State filed a motion for the judge to sentence defendant in the

4

extended term as a "persistent offender" under N.J.S.A. 2C:44-3(a), which the court granted before sentencing defendant on August 10, 2018 to ten years imprisonment, subject to a five-year parole ineligibility period. This appeal followed.

## II.

On appeal, defendant argues the following points:

POINT I

THE GUN THE POLICE RECOVERED SHOULD HAVE BEEN SUPPRESSED BECAUSE THE POLICE SEIZED DEFENDANT WITHOUT ARTICULABLE SUSPICION; THUS, THE SEIZURE AND SUBSEQUENT SEARCH WERE UNCONSTITUTIONAL. (RAISED BELOW).

A. THE POLICE SEIZED [DEFENDANT].

B. THE POLICE SEIZED [DEFENDANT] WITHOUT REASONABLE SUSPICION; THEREFORE THE SEIZURE VIOLATED THE FOURTH AMENDMENT.

C. THE [MOTION JUDGE] ERRED IN [HIS] ANALYSIS OF DEFENDANT'S MOTION TO SUPPRESS BECAUSE [HE] FAILED TO CONSIDER THE TOTALITY OF THE CIRCUMSTANCES.

D. THE [MOTION JUDGE] INCORRECTLY FOUND THAT [DEFENDANT] ABANDONED THE HANDGUN.

5

POINT II

DEFENDANT'S CONVICTION MUST BE VACATED BECAUSE IT IS THE PRODUCT OF AN UNFAIR TRIAL DUE TO JURY BIAS. (NOT RAISED BELOW).

POINT III

THE TRIAL [JUDGE'S] IMPOSITION OF AN EXTENDED TERM SHOULD BE REVERSED. (NOT RAISED BELOW).

We are unpersuaded by these contentions.

In our review of the grant or denial of a motion to suppress, we "must defer" to the motion judge's factual findings, "so long as those findings are supported by sufficient evidence in the record." State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). We defer to those findings because they "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Lamb, 218 N.J. 300, 313 (2014) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We will disregard those findings only when a trial court's findings of fact are clearly mistaken and "the interests of justice demand intervention and correction." State v. Hagans, 233 N.J. 30, 37-38 (2018) (quoting State v. Gamble, 218 N.J. 412, 425

6

(2014)).  However, we review a motion judge's legal conclusions de novo.  Dunbar, 229 N.J. at 538; see also State v. Gandhi, 201 N.J. 161, 176 (2010).

### III.

Guided by those principles, we begin our review by addressing defendant's argument that the detectives unlawfully seized him because they stopped him without having a reasonable suspicion of any criminal activity.  According to defendant, his seizure began when the detectives made the U-turn to conduct further observations of defendant.  We disagree.

Both the federal and State constitutions protect citizens against unreasonable searches and seizures.  See U.S. Const. amend. IV; see also N.J. Const. art. I, ¶ 7; State v. Terry, 232 N.J. 218, 231 (2018).  "The test of reasonableness cannot be fixed by per se rules; each case must be decided on its own facts."  Terry, 232 N.J. at 231 (quoting South Dakota v. Opperman, 428 U.S. 364, 372-73 (1976)).

There are three types of interactions with law enforcement that involve different constitutional implications depending on the event's impact on an individual's freedom to leave the scene.  First, a "field inquiry" is essentially "a voluntary encounter between the police and a member of the public in which the police ask questions and do not compel an individual to answer."  State v.

7

Rosario, 229 N.J. 263, 271 (2017).  The individual is free to leave and therefore does not require a well-grounded suspicion of criminal activity before its commencement.  Ibid.; see also Elders, 192 N.J. at 246.  Next, an investigatory stop or detention, sometimes referred to as a Terry [1] stop, involves a temporary seizure that restricts a person's movement and therefore implicates constitutional requirements that require "specific and articulable facts which, taken together with rational inferences from those facts" provide a "reasonable suspicion of criminal activity."  Elders, 192 N.J. at 247 (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)); see also Rosario, 229 N.J. at 272.  Last, arrests require "probable cause and generally [are] supported by an arrest warrant or by demonstration of grounds that would have justified one."  Rosario, 229 N.J. at 272.

When "determining whether a seizure occurred, a court must consider whether 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave.'"  State v. Stovall, 170 N.J. 346, 355 (2002) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)); see also State v. Tucker, 136 N.J. 158, 164 (1994).  We have previously held that a police officer does not illegally

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

seize an individual when an officer makes a U-turn to follow the individual, where, as here, the officer does so without activating the vehicle's siren, or otherwise asserting his or her authority, and then stops an individual only after the individual discards an item they unlawfully possessed.  See State v. Hughes, 296 N.J. Super. 291, 296-97 (App. Div. 1997).  For that reason, we conclude that the motion judge here correctly concluded an unlawful seizure did not take place when the detective decided to make the U-turn as argued by defendant.

We are not persuaded to the contrary by defendant's reliance on Tucker, 136 N.J. at 158 or United States v. Crandell, 668 F. Supp. 2d 635 (D.N.J. 2009).  Neither situation existed here.

In Tucker, the defendant was sitting on a curb when he saw the police and fled.  As the police pursued him, he discarded packets which contained cocaine.  The Court found there was no reasonable, articulable basis for the police to stop the defendant merely because he fled when he saw the police.  Because the defendant had been unlawfully seized, the cocaine the police recovered had to be suppressed.  Tucker, 136 N.J. at 172.  The Court stated, "[t]he difficulty with this case is that the sole basis asserted for police action was the youth's flight."  Id. at 168-69.

A-0203-18T2

That was not the situation in this case. Here, there was no pursuit and the police saw the gun after defendant chose to drop it, which supported their stopping of defendant. Unlike the defendant in Tucker, it was the observation of the item being discarded that provided Cincilla and Acosta with the required justification to stop defendant.

The facts in Crandell are also clearly distinguished from those in this matter. There, the trial court concluded from the totality of the circumstances that the defendant was seized when officers, who were acting in response to a tip they received, conducted a stop of the defendant by forming a semi-circle around defendant, standing about two feet from him, and then during a pat down, defendant ran and the weapon fell from his pants. The court held that "a reasonable person, in [defendant's] circumstance, would not have felt that he or she could terminate the encounter." Crandell, 668 F. Supp. 2d at 648. The court stated that "[t]he submission, created by the compliance to the officer's show of authority, established the point in time that a seizure occurred." Id. at 650.

Here, again, the police stopped defendant only after they witnessed his disposal of the handgun, not while in pursuit after he had been stopped. At no time prior to that stop did the police do anything to assert their authority over

10

defendant. Under the circumstances of this case, we have no reason to disturb the denial of defendant's suppression motion in this regard.

We also reject defendant's next contention that the motion judge failed to consider the totality of the circumstances when determining defendant's motion. Specifically, defendant argues the judge did not "consider whether the detectives possessed any reasonable suspicion when they decided to maneuver the vehicle and pursue [defendant] for an investigatory stop." We find no merit to this contention.

In order to stop defendant, the State had the burden to prove the police were aware of "specific and articulable facts which, taken together with rational inferences from those facts, [gave] rise to a reasonable suspicion of criminal activity." State v. Mann, 203 N.J. 328, 338 (2010) (quoting State v. Pineiro, 181 N.J. 13, 20 (2004)); see also Terry, 392 U.S. at 20. If there was no reasonable suspicion, evidence discovered during a search conducted during the detention is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

To determine whether reasonable suspicion existed, a court must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554 (2019)

(quoting Stovall, 170 N.J. at 361). This analysis may also consider police officers' "background and training," id. at 555, including their ability to "make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person,'" ibid. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). "'Furtive' movements by [a] defendant," by themselves, "cannot provide reasonable and articulable suspicion to support a detention in the first instance." Rosario, 229 N.J. at 277; see also State v. Dunbar, 434 N.J. Super. 522, 527-28 (App. Div. 2014).

Investigative stops are justified, even absent probable cause, "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." State v. Davis, 104 N.J. 490, 505 (1986).

Courts are to determine whether the totality of the circumstances gives rise to an "articulable or particularized" suspicion of criminal activity, not by use of a strict formula, but "through a sensitive appraisal of the circumstances in each case." Ibid. Our Supreme Court recognized the two-step analysis set forth in United States v. Cortez, 449 U.S. 411, 418 (1981),

> for determining whether the totality of circumstances creates a "particularized suspicion." A court must first

consider the officer's objective observations. The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." "[A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." Second, a court must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing."

[Id. at 501 (alterations in original) (citations omitted) (quoting Cortez, 449 U.S. at 418).]

Here, we conclude the motion judge properly considered the totality of the circumstances and correctly concluded that the detectives did not require a "reasonable suspicion" to make a U-turn to further observe defendant, but rather did need the required level of suspicion prior to stopping defendant and that the State satisfied its burden by relying upon Cincilla's unrefuted testimony that he observed defendant discard the handgun before stopping defendant. Nothing more was required.

Defendant's argument to the contrary is belied by the record, as the judge made findings about what happened prior to the U-turn, including that the detectives did not determine to stop defendant on a "hunch." Rather, they did so only when they witnessed defendant discarding the handgun. The judge's

13

findings were supported by the unrefuted credible evidence adduced at the suppression hearing. Again, we have no cause to disturb that result.

To the extent defendant also argues that without the detectives having the articulable suspicion necessary to stop him, the seizure of the gun was unlawful and the handgun should have been suppressed as fruit of the poisonous tree, we disagree with his contention primarily based upon our earlier conclusions. However, and also contrary to defendant's argument on appeal, the seizure of the gun after defendant discarded it was not, in any event, unlawful as he no longer had any privacy interest in the weapon after he threw it away.

It is settled that a defendant has no expectation of privacy in property that he or she has abandoned. State v. Burgos, 185 N.J. Super. 424, 428 (App. Div. 1982). "For purposes of search-and-seizure analysis," a defendant who abandons property "no longer retain[s] a reasonable expectation of privacy with regard to it at the time of the search." State v. Carroll, 386 N.J. Super. 143, 160 (App. Div. 2006) (quoting State v. Farinich, 179 N.J. Super. 1, 6 (App. Div. 1981), aff'd o.b., 89 N.J. 378 (1982)). "In the context of the Fourth Amendment a defendant 'abandons' property when he voluntarily discards, leaves behind or otherwise relinquishes his interest in the property in

question . . . ." Farinich, 179 N.J. Super. at 6; see also Carroll, 386 N.J. Super. at 160; State v. Gibson, 318 N.J. Super. 1, 11 (App. Div. 1999). Property is not abandoned if a defendant discards an article in response to unlawful police actions. See Tucker, 136 N.J. at 172.

Defendant's discarding of his weapon as observed by the detectives constituted an abandonment, allowing for the detective's recovery of the weapon. We agree with the motion judge, who correctly reasoned that the police had ample reason to confiscate the revolver once it had been discarded by defendant. The gun had been abandoned, as defendant had relinquished any expectation of privacy in it. See Farinich, 179 N.J. Super. at 6 (finding abandonment where a defendant, after being approached by the police in an airport, dropped his suitcase and started to run away); see also Hughes, 296 N.J. Super. at 296 (holding that a defendant on a bicycle abandoned a container filled with bags of cocaine, because he threw the container against a curb when he noticed a police car approaching, and then continued to bicycle another fifty feet away).

There is nothing in the record to support defendant's contention that somehow the detectives forced him to discard the gun or that it was the result of an unlawful stop or seizure. As the motion judge found, the detectives only

decided to stop defendant after they saw defendant drop the gun to the ground. There was no coercion or unlawful act arising from the detectives simply driving by defendant.

IV.

Having determined that the suppression motion was properly denied, we turn to defendant's argument that his "right to a fair trial and an impartial jury was compromised by the intrusion of irregular influences inside the jury room." Defendant cites to three instances involving jurors to support his contention.

Defendant first argues that potential juror number two, J.H., was not impartial because he held preconceived notions about the truthfulness of police officer testimony. J.H. never sat as a juror as defendant exercised one of his peremptory challenges to excuse the juror. Before being excused, J.H. informed the judge that he had relatives and friends who were police and corrections officers and that he would be "more likely [to] find that a police officer would tell the truth than a witness who's not a police officer and give greater weight [to the police officer's testimony]." In response to the trial judge's inquiry about whether J.H. could still be impartial, J.H. stated that although being a police officer was a difficult profession, there were police

officers who were "bad apples," and that he would be able to follow judge's instructions about determining credibility. Defendant thereafter asked that J.H. be excused for cause, which the judge denied after concluding that "basically the bottom line is [the juror] says [he] can be fair and impartial." Afterward, defendant exercised one of his peremptory challenges and excused the juror.

Defendant next argues that another potential juror, juror number seven, P.W., who he also excused by exercising a peremptory challenge, was partial because she exhibited preconceived biases in favor of law enforcement. When questioned by the trial judge, P.W. stated that her brother was a member of law enforcement, and generally she would find that a police officer was more likely to tell the truth than a lay person. However, in response to the judge's further inquiry, she stated she thought she could follow the judge's instructions on credibility and stated that "I think everyone has inherent biases, whether they know them or not. And I think I can – if I'm aware of that, I can counteract that." Defendant did not ask to excuse the juror for cause, but exercised another peremptory challenge to remove the juror.

Finally, defendant argues that juror fourteen, one of the seated jurors, attended an event where a shooting occurred the night before trial, which

17

created an impression that the juror could not be impartial. After the jury was sworn in, and in response to defense counsel's request, the judge inquired of all the jurors whether they had knowledge of the event and shooting that occurred the evening before. Juror fourteen responded, and the judge called the juror to sidebar, to determine whether she could remain impartial despite having gone to the event during which the shooting took place. The juror told the judge that she was at the event for two hours, but she left before the shooting occurred and she had not read any newspaper articles regarding the shooting, although her husband mentioned the shooting the next morning. She described her experience at the event, as "perfectly fine" and "nice." She informed the judge that her attendance at the event would not impact her ability to remain impartial during trial.

At sidebar, the judge and counsel discussed the juror. Defense counsel stated that he was not asking that the juror be excused "for cause because, based on what she's told us, she was there prior to the event taking place and hasn't impacted her in any way." He also confirmed that he was "satisfied" with the way the judge "addressed the juror[s] about their knowledge, having read anything, [or] heard about [the shooting]."

18

We leave the selection and management of the jury to the sound discretion of the trial judge. State v. Brown, 442 N.J. Super. 153, 182 (App. Div. 2015) (quoting State v. R.D., 169 N.J. 551, 559 (2001)). "This standard respects the trial [judge's] unique perspective and the traditional deference we accord to [them] in 'exercising control over matters pertaining to the jury.'" Ibid. (quoting R.D., 169 at 559-60).

Litigants are entitled to "an unbiased jury" and "a fair jury selection process." Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 40 (2009). Voir dire determinations are traditionally within the broad discretionary powers vested in the trial court and "its exercise of discretion will ordinarily not be disturbed on appeal." State v. Murray, 240 N.J. Super. 378, 392 (App. Div. 1990) (quoting R. 1:8-3(a)). Accordingly, we will not reverse a trial court's decision regarding removal of a juror for cause unless the court has abused its discretion. State v. DiFrisco, 137 N.J. 434, 459 (1994).

If a party does not move to excuse a juror for cause, we consider whether, in the interests of justice, we should recognize plain error. R. 2:10-2. To find plain error, the error must be "clearly capable of producing an unjust result." Ibid. Defendant bears the burden of proving plain error. State v. Weston, 222 N.J. 277, 295 (2015).

In order for a forced expenditure of a peremptory challenge to constitute reversible error, a defendant must demonstrate that a partial juror participated in deliberations as a result of defendant's exhaustion of peremptories. DiFrisco, 137 N.J. at 470. To prove that error, defendant must show

> (1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenge and that defendant exhausted his remaining challenges; and (3) that at least one of the remaining jurors that sat on the jury was a partial juror.
>
> [Id. at 471.]

In our review of decisions relating to the jury, we also are guided by the principle that "[a] defendant's right to be tried before an impartial jury is one of the most basic guarantees of a fair trial." State v. Loftin, 191 N.J. 172, 187 (2007). "A trial is poisoned at its inception if the jurors deciding the case cannot review the evidence dispassionately, through the light of reason." Ibid. (quoting State v. Fortin, 178 N.J. 540, 575 (2004)).

In the selection of a jury, "trial courts must be allotted reasonable latitude when conducting voir dire and, therefore, a reviewing court's examination should focus only on determining whether 'the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury.'" State v. Winder, 200 N.J. 231, 252 (2009) (quoting State v.

20

<u>Biegenwald</u>, 106 N.J. 13, 29 (1987)).  The court is "not obliged to ask any particular question or indulge the defendant's requests absolutely."  <u>State v. Lumumba</u>, 253 N.J. Super. 375, 394 (App. Div. 1992).

The decision to remove a juror for cause requires a showing that the juror's views would "prevent or substantially impair the performance of that juror's duties in accordance with the court's instructions and the juror's oath." <u>DiFrisco</u>, 137 N.J. at 469.  The goal is to seat a juror who, despite a disclosed and acknowledged bias, commits himself or herself to being impartial and following the judge's instructions.  <u>See</u> <u>Winder</u>, 200 N.J. at 251-53; <u>State v. Fuller</u>, 182 N.J. 174, 203-04 (2004); <u>State v. Williams</u>, 93 N.J. 39, 61 (1983); <u>Brown</u>, 442 N.J. Super. at 182-84.

Applying these guiding principles here, we conclude that the trial judge in all three instances properly exercised his discretion.  There is no indication from the record that J.H. or P.W. would not have been an impartial juror warranting their removal for cause.  Both confirmed that they could follow the judge's instructions and would be impartial.  And, defendant has not offered any evidence that a seated juror was a partial.  In any event, neither juror was seated.  <u>State v. Gilmore</u>, 103 N.J. 508, 530 (1986).

21

As to the seated juror, she clarified the nature of her exposure to the event the night before trial and confirmed that she too could be impartial. Defendant did not object to the juror remaining a member of the panel and he has failed to establish any error, let alone plain error, especially in light of the overwhelming evidence of defendant's having committed the charged offense.

V.

As we have no reason to disturb defendant's conviction, we turn to his contention that his sentence in the extended term should be vacated because the trial judge rejected defendant's argument at sentencing that mitigating factors one and two applied. We disagree.

At sentencing, in response to the State's motion and as set forth in the judge's thorough oral decision, the trial judge determined that defendant met the statutory criteria to be considered a persistent offender under N.J.S.A. 2C:44-3 and therefore he was eligible for sentencing in the extended term of up to twenty years imprisonment subject to a ten-year period of parole ineligibility. However, in reaching his decision that defendant should serve ten years, with a five-year period of parole ineligibility, the judge weighed the aggravating and mitigating factors. The judge applied aggravating factors three, the risk that defendant would commit another offense, N.J.S.A. 2C:44-

A-0203-18T2

1(a)(3), six, defendant's criminal history, N.J.S.A. 2C:44-1(a)(6), and nine, the need to deter defendant, N.J.S.A. 2C:44-1(a)(9).

The judge also considered and applied mitigating factor eleven, that imprisonment would cause excessive hardship, N.J.S.A. 2C:44-1(b)(11). While he did not apply mitigating factors one and two, defendant's conduct neither caused nor threatened serious harm, N.J.S.A. 2C:44-1(b)(1), and defendant did not think his conduct would threaten or cause serious harm, N.J.S.A. 2C:44-1(b)(2), respectively, the judge considered them, and rejected their application based upon defendant's prior convictions and corresponding prison sentences related to being in possession of a weapon. The judge specifically stated the following:

> In terms of mitigating factors, I know the defense counsel, urges in his sentencing memo to find support for mitigating factors [one] and [two]. Defendant's conduct neither caused nor threatened serious harm, as well as mitigating factor number [two], the defendant did not [contemplate] that his conduct would cause a threat and serious harm. The [c]ourt cannot find support. He was specifically told when he was sentenced in 2007 . . . that the reason for the lengthy prison term, the reason for the parole ineligibility was to deter him from ever carrying a handgun, a weapon again. Despite spending many years in prison, it seems like within three weeks of getting out of State Prison, he once again carried a handgun and while it's certainly, the [c]ourt recognizes he's not charged with shooting that firearm, it's clear that he should have

23

understood that type of conduct, carrying a handgun cannot be tolerated and certainly the handgun is only carried because it can cause or can threaten serious harm.

We "review sentencing determinations in accordance with a deferential standard. [In our review, we] must not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). We will affirm a sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"In exercising its authority to impose [a] sentence, the trial court must identify and weigh all of the relevant aggravating factors that bear upon the appropriate sentence as well as those mitigating factors that are 'fully supported by the evidence.'" State v. Blackmon, 202 N.J. 283, 296 (2010) (quoting State v. Dalziel, 182 N.J. 494, 504-05 (2005)). Under the persistent offender statute, N.J.S.A. 2C:44-3(a), a sentencing court has discretion "to impose an extended sentence when the statutory prerequisites for an extended-

24

term sentence are present." State v. Pierce, 188 N.J. 155, 161 (2006); see also State v. Hudson, 209 N.J. 513, 526 (2012) (quoting N.J.S.A. 2C:44-3) ("Pursuant to the persistent offender statute, a court 'may, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime of the first, second or third degree to an extended term of imprisonment' if the individual is found to be a persistent offender.").

Here, the trial judge did not err by declining to apply mitigating factors one and two. The judge considered the two factors but declined to apply them because the evidence did not support their application. The judge noted how defendant had been warned previously about the seriousness of possessing a weapon and that the reason for his prior sentence was to deter him from carrying a gun again, yet he was convicted again of possessing a weapon.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0203-18T2